UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:                                          CASE NO. 08-51207

EAST CAMERON PARTNERS, L.P.                     CHAPTER 11

                    DEBTOR


# FIRST AMENDED DISCLOSURE STATEMENT
# FOR THE FIRST AMENDED CHAPTER 11 PLAN OF
# REORGANIZATION FILED BY EAST CAMERON PARTNERS, L.P.

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD
STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
ELIZABETH R. CARTER (#31090)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
*Attorneys for East Cameron Partners, L.P.*

# TABLE OF CONTENTS

I.   INTRODUCTORY STATEMENT..................................................................5
     A.   Adequacy of the Disclosure Statement..............................................5
     B.   Cramdown, Solicitation, Voting, and Ballots.......................................5
     C.   Source of Information....................................................................6
     D.   Disclaimers..................................................................................7
II.  DESCRIPTION AND BUSINESS OF THE DEBTOR.......................................8
     A.   History of the Debtor and Description of the Properties............................8
     B.   The Sukuk Loan Transaction............................................................9
     C.   Significant Events Leading to the Filing of the Petition for Relief............14
     D.   Significant Events During the Chapter 11 Proceedings............................15
          1.   Adversary Proceeding No. 08-05041........................................15
          2.   Assumption of the Leases with Minerals Management Services...................16
          3.   Other Significant Bankruptcy Case Events....................................16
          4.   Whitney Bank Wire Transfer Fraud............................................17
          5.   Sale of Certain of the Debtor's Assets.........................................18
     E.   Partners of the Debtor...................................................................23
     F.   Management of the Debtor...............................................................23
          1.   Management of the Debtor Prior to Appointment of the CRO.....................23
          2.   Management of the Debtor Following Appointment of the CRO.................23
III. DESCRIPTION OF THE PLAN.................................................................24
     A.   Summary of the Plan.....................................................................24
     B.   Unclassified Claims......................................................................25
          1.   Administrative Claims..........................................................25
          2.   Professional Fee Claims........................................................26
          3.   Priority Tax Claims............................................................26
     C.   Classification and Treatment of Claims and Interests..............................26
          1.   Class 1: Other Priority Claims.................................................26
          2.   Class 2: Secured Claims.......................................................27
          3.   Class 3: General Unsecured Claims.............................................27
          4.   Class 4: Subordinated Unsecured Claim........................................27
          5.   Class 5: Debtor Interest Claims................................................27
     D.   Means of Implementation of the Plan.................................................28
          1.   Creation of Liquidating Trust and Appointment of Liquidating Trustee.....28
               a.   Establishment of the Liquidating Trust................................28
               b.   Purpose of the Liquidating Trust......................................28
               c.   Transfer of Trust Assets by Debtor to the Liquidating Trust.........28
               d.   Appointment of the Liquidating Trustee...............................28
               e.   Successor Liquidating Trustee........................................28
               f.   Powers and Duties of the Liquidating Trustee.........................29
               g.   Payment of Fees and Expenses of the Liquidating Trustee............29
               h.   Liability.............................................................29
               i.   Termination of Liquidating Trust and Liquidating Trustee..........30
          2.   Conditions Precedent to Confirmation and Effectiveness of Plan and Waiver

2

| | | and Timing of Same | 30 |
|---|---|---|---|
| | 3. | Payment to Administrative Claimants | 31 |
| | 4. | Payment or Satisfaction of Claims in Classes 1, 2 and 3 | 31 |
| E. | | Executory Contracts and Unexpired Leases | 31 |
| F. | | Release, Discharge, Injunction, and Exculpation | 32 |
| | 1. | Release by the Debtor | 32 |
| | 2. | Discharge | 33 |
| | 3. | Continuance of Automatic Stay and Injunctions | 34 |
| | 4. | Injunction | 34 |
| | 5. | Exculpation and Limitation of Liability | 35 |
| G. | | Other Provisions of the Plan | 36 |
| | 1. | Transfer of Assets by Debtor to the Liquidating Trust | 36 |
| | 2. | Reservation of Claims | 36 |
| | 3. | Objections to Claims | 37 |
| | 4. | Default Under the Plan | 38 |
| | 5. | Modification of the Plan | 38 |
| | 6. | Revocation of the Plan | 38 |
| | 7. | Payment of Statutory Fees | 39 |
| | 8. | Payment of Post-Confirmation Fees and Expenses | 39 |
| | 9. | Exemption from Transfer Taxes | 39 |
| | 10. | Retention of Jurisdiction | 39 |
| IV. | | FINANCIAL INFORMATION | 39 |
| A. | | Current Financial Statement and Information | 39 |
| | 1. | The Debtor's Assets | 41 |
| | 2. | The Debtor's Liabilities | 41 |
| V. | | MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN FOR THE DEBTOR AND CERTAIN HOLDERS OF CLAIMS | 41 |
| A. | | Tax Consequences to the Reorganized Debtor and Debtor Partners | 42 |
| | 1. | Overview | 42 |
| | 2. | Discharge of Partnership Debt | 43 |
| | | a. Cancellation of Indebtedness Income as COD Income | 43 |
| | | b. Cancellation of Indebtedness as Deemed Distribution | 44 |
| | 3. | Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes | 45 |
| | 4. | Liquidation of Debtor | 45 |
| B. | | Tax Consequences to the Existing Partnership Interests | 46 |
| | 1. | General Overview | 46 |
| | | a. Factors Affecting the Tax Treatment of Holders' Gain or Loss | 46 |
| | | b. Receipt of Interest | 46 |
| | | c. Original Issue Discount and Market Discount | 47 |
| | | d. Installment Method Reporting | 47 |
| | | e. Bad Debt Deduction | 47 |
| | 2. | Consequences to Holder of Class 1 Claim: Other Priority Claims | 48 |
| | 3. | Consequences to Holders of Class 2 Claims: Secured Claims | 48 |
| | 4. | Consequences to Holders of Class 3 Claims: General Unsecured Claims | 49 |

3

|   | 5. | Consequences to Holders of Class 4 Claims: Subordinated Unsecured Claims..................................................................................................49 |
|---|----|----|
|   | 6. | Consequences to Holders of Class 5 Claims: Debtor Interests Claims. ..............................................................................49 |
| C. | Information Reporting and Backup Withholding....................................................50 |
| D. | The Disputed Claims Reserve................................................................................50 |
| VI. | ALTERNATIVES TO THE PLAN.......................................................................................50 |
| VII. | VOTING PROCEDURES....................................................................................................51 |
| A. | Ballots and Voting Deadline..................................................................................51 |
| B. | Claims Existing Partnership Interests Entitled to Vote.........................................52 |
| VIII. | CONFIRMATION OF THE PLAN......................................................................................52 |
| A. | Confirmation Hearing.............................................................................................52 |
| B. | Requirements for Confirmation of the Plan...........................................................53 |
| C. | Cramdown...............................................................................................................55 |
| D. | Feasibility...............................................................................................................55 |
| IX. | CONCLUSION....................................................................................................................56 |

# I.  INTRODUCTORY STATEMENT

On October 16, 2008, East Cameron Partners, L.P. ("ECP" or "Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Louisiana (the "Bankruptcy Court"). The Debtor has filed its First Amended Chapter 11 Plan of Reorganization Filed by East Cameron Partners, L.P. (the "Plan"), a full copy of which is attached as Exhibit 1 to this First Amended Disclosure Statement for the First Amended Chapter 11 Plan of Reorganization Filed by East Cameron Partners, L.P. (the "Disclosure Statement." For the most part, all capitalized terms used in both this Disclosure Statement and the Plan are defined in Section 1.2 of the Plan, at pages 3 through 13.[1]

All persons receiving this Disclosure Statement and the Plan attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached hereto, in addition to reviewing the text of this Disclosure Statement. This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to explain the various aspects of the Plan as it affects all Holders of Claims and Interests. However, to the extent any questions arise, the Debtor urges you to seek independent legal advice.

**A.  Adequacy of Disclosure Statement.** By Order dated _____, 2010, the Bankruptcy Court determined that this Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor to make an informed judgment concerning the Plan. The Bankruptcy Court's approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan. The Bankruptcy Court has not authorized any other representation, statement, or warranty concerning the Plan, the Debtor, its future business operations or the value of the Debtor's Assets. You should not rely upon any information, representation or inducement that might have been made to obtain your acceptance that varies with or is otherwise, inconsistent with the information in this Disclosure Statement.

**B.  Cramdown, Solicitation, Voting, and Ballots.** Provided that at least one class of Impaired Claims votes in favor of the Plan, if any class or classes of Creditors whose Claims are Impaired fails to accept the Plan, it may still be confirmed under the "cramdown" provisions of Section 1129(b) of the United States Bankruptcy Code. These provisions require that the Plan be fair and equitable as to the objecting class. As to a class of Unsecured Creditors, this means that the class must be paid in full before any junior class of Claims or Interests receive or retain any property under the Plan. This principle is sometimes referred to as the "Absolute Priority Rule."[2] In order to

---

1    Because some terms are used on a limited basis in the Disclosure Statement, several additional terms are defined in the text of the Disclosure Statement as those terms are used. Most capitalized terms are defined in the Plan and reference should be made to such defined terms in the Debtor's Plan.

2    *Collier on Bankruptcy* (15th Ed.) at §1129.04[4][a][I] summarizes the "Absolute Priority Rule" as follows:

"a plan of reorganization may not allocate any property whatsoever to any junior class on account of the member's interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their Allowed Claim, or the debtor's

5

establish that the Plan is fair and equitable as to the Secured Creditors, the Plan must provide such Secured Creditors with the indubitable equivalent of their Claim or that they retain their Lien on, and receive deferred cash payments equal to the value of their interest in, property of the Estate securing such Claim. The Debtor believes that the Plan meets these requirements and hereby requests confirmation of the Plan under Section 1129(b) if one or more classes fail to accept the Plan. Alternatively, the Debtor reserves the right to amend the Plan and the treatment of any junior class of Claims or Interests to conform the Plan to the requirements of the Absolute Priority Rule.

In order to vote on the Plan, a Creditor or Interest Holder must have filed a Proof of Claim or Interest prior to July 22, 2009, unless the Claim is scheduled by the Debtor and it is not described in the Schedules as disputed, unliquidated or contingent. Any Creditor scheduled as undisputed, liquidated, and not contingent, is to the extent scheduled, deemed to have filed a Claim. In order for the Plan to be accepted by Creditors, a majority in number and two-thirds (2/3) majority in amount of Claims filed, allowed (for voting purposes) and voting in each Impaired class of Creditors must vote to accept the Plan. In order for the Plan to be accepted by Interest Holders, a two-thirds (2/3) majority in amount of Interests allowed (for voting purposes) and voting in each Impaired class of Interests must vote to accept the Plan. If the Debtor is unable to obtain the requisite acceptances, then they may be able to obtain confirmation of the Plan, despite the non-acceptance of one or more classes pursuant to 11 U.S.C. §1129(b) as discussed more fully above.

**THE DEBTOR BELIEVES THAT THE PLAN OF REORGANIZATION PROPOSED HEREIN IS IN THE BEST INTERESTS OF ALL CREDITORS AND HOLDERS OF INTERESTS. AS SUCH, THE DEBTOR STRONGLY URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., CENTRAL STANDARD TIME, ON _____, 2010, WHICH IS THE VOTING DEADLINE SET BY THE BANKRUPTCY COURT.**

A Holder of a Claim or Interest may vote on the Plan by filling out and mailing the enclosed Master Ballot. The voting procedure is fully described at Article VII of this Disclosure Statement. Please note that facsimile copies of the Ballot will not be accepted, unless the Debtor specifically consents to such a facsimile copy, and the Ballot must bear an original signature. The ballots must be returned by _____, 2010 and no vote received after such time will be counted nor included in the vote tally in any manner. Whether a Holder of a Claim or Interest votes on the Plan or not, such Holder will be bound by the terms of the Plan if such Plan is confirmed. You are, therefore, urged to complete, date, sign, and promptly mail the ballot to Stewart F. Peck, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, 601 Poydras Street, Suite 2775, New Orleans, LA 70130, in the envelope provided.

**C.     Source of Information.** Except as otherwise expressly indicated, portions of this Disclosure Statement describing the Debtor, its business, properties and management have been prepared from information furnished by the Debtor and its professionals including former professionals.

---

reorganization value, whichever is less."

6

**D. Disclaimers.** APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND PARTNERSHIP INTEREST HOLDERS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS, INTEREST HOLDERS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN OR TAKE A POSITION WITH RESPECT TO THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED SCHEDULES HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. DUE TO THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETELY ACCURATE, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO ENSURE ACCURACY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, IT IS THE DEBTOR'S POSITION THAT THIS

7

DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

DEBTOR ASSERTS THAT THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, AND IT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE DEBTOR'S REORGANIZATION ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

TO THE EXTENT ALLOWED BY LAW, DEBTOR EXPRESSLY RESERVES THE RIGHT TO TAKE A POSITION CONTRARY TO ANY OPNION OR POSITION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO A CONTRARY OR CONFLICTING POSITION FOR PURPOSES OF ANY TAX LIABILITY, CALCULATION, OR TREATMENT.

## II. DESCRIPTION AND BUSINESS OF THE DEBTOR

### A. History of the Debtor and Description of the Properties

ECP is an independent oil and gas exploration and production company, organized as a limited partnership under the laws of the State of Texas and taxed as a partnership pursuant to subchapter K of the Tax Code. ECP holds leasehold Interests in a producing gas and condensate field in federal waters of the United States approximately twenty (20) miles offshore the State of Louisiana consisting of (i) a 100% undivided record title interest (with a 79.87% net revenue interest) in East Cameron Block 72 and (ii) a 100% undivided operating rights interest (with an 80.51% net revenue interest) in and to a portion of East Cameron Block 71. (EC 71 and EC 72 are collectively referred to herein as the "Properties.")

ECP's Interests in the Properties are federal oil and gas leases and, therefore, are administered by the Minerals Management Service of the United States Department of the Interior (the "MMS"). ECP is an official MMS-recognized operator for the Properties and, in its capacity as "operator", controls exploration and production activities related to the Properties.

The Properties are encumbered by royalties payable to the United States Government under the Leases. The United States Government's royalty on EC 71 is 16.7% plus certain other amounts that are payable from time to time. The United States Government's royalty on EC 72 is 12.5%. Certain private parties also hold overriding royalty Interests in the Properties. These private royalty holders and the United States Government are collectively referred to herein as the Royalty Holders. After deducting the royalties owed to the Royalty Holders, ECP holds an 80.51 net revenue interest in EC 71, and a 79.87% net revenue interest in EC 72.

Hydrocarbons were first discovered on the Properties by Conoco Inc. and others in 1954, with production commencing in 1958. The production facilities for the Properties are comprised of two

8

platforms (the A platform and the C platform) and two free standing, single-well caissons. The equipment on the platforms consists of an array of pipes, valves, meters, separators, scrubbers, pumps, holding tanks, wellheads and generators. Since taking over operations on the Properties in 2003, ECP has drilled six (6) wells (six (6) of which were successful) and performed seven (7) recompletions (seven (7) of which were successful). As of the Petition Date, there were six (6) wells producing in paying quantities on the Properties. ECP's sole source of revenue is production revenue from the Properties.

## B.     The Sukuk Loan Transaction

In order to refinance existing indebtedness related to the Properties, and to help realize the significant development potential of the Properties, ECP sought traditional collateralized financing opportunities beginning in 2006. However, ECP's potential investors preferred to structure the financing as a Shari'ah-compliant[3] transaction in an attempt to create the first asset-backed "sukuk" offering in the United States market. To be Shari'ah compliant, the financing had to be structured in such a manner as to avoid the appearance of charging interest or investing in speculative activities. Bankruptcy remoteness was also an important concern from both an investment and Shari'ah standpoint.

A "sukuk" is essentially a financial certificate or bond that can take one of several forms. One such form is the asset-securitized sukuk, which generally involves the following steps: (a) the transfer of assets from an originator into a trust or similar special purpose vehicle ("*SPV*"), (b) sukuk issuance from the SPV to the sukuk certificate holders, and (c) payments on the sukuk derived from payments received in respect of those transferred assets. ECP's financing was ostensibly structured as a sukuk in the form of an asset-securitized sukuk. An overriding royalty interest in the Properties (the "*ORRI*") was selected to collateralize the sukuk offering. Thus, the ORRI, as such term is more particularly defined in the Plan, was used as security for the loan to ECP.

In order to create the appearance of Shari'ah compliance, obtain a good rating on the transaction, and still for all intents and purposes be considered a loan with concomitant interest deductible for tax purposes, the deal had to be structured in such a manner in which ECP purported to transfer all the right, title and interest in the ORRI to a "bankruptcy-remote" SPV. In turn, the SPV was to grant a first-priority security interest over the ORRI to secure the payments to the sukuk holders.[4] The transaction also included an additional step beyond the basic structure discussed above. Specifically, the "asset holding" SPV, LOH, pledged the asset to a "sukuk-issuing" SPV, namely, ECGC. In turn, ECGC, as the "sukuk-issuing" SPV, offered sukuk certificates to investors (the "Sukuk Certificateholders"). ECP purported to transfer the ORRI to LOH. In turn, LOH pledged (granted a security interest in) the ORRI to ECGC.

---

3     Shari'ah is the body of Islamic religious law.
4     ECP filed a separate Complaint which is pending as Adversary Proceeding No. 08-5041. Exhibit "B" to that Complaint therein includes a more detailed overview and summary of the sukuk loan transaction. A copy of which can be obtained through the Public Access to Court Electronic Records ("PACER") system which can be accessed through the world wide web at http://pacer.psc.uscourts.gov/. Additionally, a copy can be obtained by contacting the Clerk of the Bankruptcy Court or undersigned counsel.

9

LOH was intentionally structured as a bankruptcy-remote SPV in an attempt to isolate both LOH and the ORRI from a bankruptcy or insolvency proceeding, to preclude the protections offered by the United States Bankruptcy Code. ECP owns 100% of the membership interest of LOH and LOH is treated as an entity disregarded from ECP for purposes of federal income tax. However, LOH also has an "Independent Member." Under the terms and conditions the LLC Agreement, the Independent Member is afforded certain powers and responsibilities intended to prevent LOH from entering bankruptcy.[5]

Under the Sukuk structure, the loan proceeds flowed from the sukuk certificate holders to ECGC, from ECGC to LOH, and from LOH to ECP. ECGC offered $165.67 million of sukuk certificates to investors and then advanced the proceeds of the offering to LOH. LOH, in turn, used the funds as follows: (a) LOH advanced $113.49 million to ECP in exchange for security rights in ECP's assets, including the ORRI; (b) LOH deposited $38.28 million into an account (the "*Earnout Account*") to fund future advances to ECP; (c) LOH deposited $9.5 million into an account designed to negate the speculative nature of oil and gas production (the "*Reserve Account*"); and (d) LOH used $4.4 million, pursuant to the Hedge Agreements, to purchase natural gas put options in order to further negate the speculative nature of the loan.

ECP then used the $113.49 million advanced by LOH as follows: (a) to re-acquire a net-profit overriding royalty interest in the Properties; (b) to pay off a prior loan (which was required for Shari'ah compliance); (c) to pay the fees associated with the current loan; (d) to fund an account to provide for operating expenses (the "*Opex Account*") with an initial balance of $5 million; (e) to pay a fee of $1 million to Merrill Lynch Commodities, Inc. for entering into a Back-up Offtake Agreement with LOH; and (f) to fund a small distribution of $166,000 to ECP.

ECP and LOH executed several documents to effect the collateralization and pledge of the ORRI, including the following: (a) Contribution Agreement, (b) Purchase and Sale Agreement, (c) Conveyance of Contributed Overriding Royalty Interest (the "*Contributed Conveyance*"), (d) Conveyance of Purchased Overriding Royalty Interest (the "*Purchased Conveyance*"), (e) Production Delivery and Marketing Agreement (the "*PDMA*"), and (f) the LLC Agreement (collectively referred to as the "*Sukuk Transaction Documents*").

As the ORRI was produced and delivered to LOH, funds flowed back upstream through LOH to ECGC, and ultimately, to the Sukuk Certificate holders. Several documents facilitated this process. In particular, the Funding Agreement was executed between LOH and ECGC and essentially required LOH to pay ECGC a "Funding Return" according to a prescribed payment schedule.

The Contribution Agreement provided that ECP agreed to contribute a portion of the ORRI (the "*Contributed ORRI*") in exchange for its membership interest in LOH.[6] The Contribution Agreement contained various boilerplate representations and warranties regarding the capacity of the parties and title to the Properties. The Contribution Agreement also set forth the time and manner for

---

5       Copies of the limited liability agreement is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "C".

6       The Contribution Agreement is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "D".

closing of the Contributed Conveyance.

Pursuant to the Contributed Conveyance, ECP purported to grant, bargain, sell, convey, assign, set over, and deliver the Contributed ORRI to LOH.[7] The Contributed Conveyance essentially defined the Contributed ORRI as a specified percentage interest ORRI in the Properties. The Contributed Conveyance provided that the Contributed ORRI would terminate once a specified quantity of hydrocarbons had been delivered to LOH either in cash or in kind. Upon termination, all of LOH's rights in the Contributed ORRI immediately terminated and the ORRI reverted to ECP. Therefore, the Contributed Conveyance provided that the encumbrances placed on the Contributed ORRI in partial consideration of the financing would automatically terminate once ECP had repaid LOH a stipulated portion of the loan.

The Purchase and Sale Agreement provided that LOH agreed to purchase a portion of the ORRI (the "*Purchased ORRI*") from ECP.[8] The Purchase and Sale Agreement contained various boilerplate representations and warranties regarding the capacity of the parties and title to the Properties. The Purchase and Sale Agreement also set forth the time and manner for closing of the Purchased Conveyance. The Purchase and Sale Agreement stipulated that the initial "purchase price" of the Purchased ORRI was $113,840,000.00. The Purchase and Sale Agreement additionally provided that an additional $38,284,000.00, which was deposited into the Earnout Account, would constitute additional "purchase price" to ECP. The funds in the Earnout Account were to be paid to ECP as additional Purchased ORRI was delivered to LOH and ECP would thereby receive the additional loan proceeds in the Earnout Account as additional collateral became available.

Pursuant to the Purchased Conveyance, ECP purported to grant, bargain, sell, convey, assign, set over, and deliver the Purchased ORRI to LOH.[9] The Purchased Conveyance essentially defined the Purchased ORRI as a specified percentage interest ORRI in the Properties. The Purchased Conveyance provided that the Purchased ORRI would terminate once a specified quantity of hydrocarbons had been delivered to LOH either in cash or in kind. Upon termination, all of LOH's rights in the Purchased ORRI immediately terminated and the ORRI would revert to ECP. Therefore, the Purchased Conveyance provided that the encumbrances placed on the Purchased ORRI in partial consideration of the financing automatically terminated once ECP had repaid LOH a stipulated portion of the loan.

The PDMA essentially functions as a master mortgage, security agreement and loan agreement between ECP and LOH governing and securing the obligations contained in the Contribution Agreement Contributed Conveyance, Purchase and Sale Agreement, and the Purchase Conveyance.[10] The PDMA contains numerous typical loan covenants regarding preservation, maintenance and delivery of the collateral, and repayment of ECP's indebtedness. For example, Section 5 of the PDMA requires ECP to maintain well production at certain rates, which impliedly

---

7    The Contributed Conveyance is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "E".

8    The Purchase and Sale Agreement is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "F".

9    The Purchased Conveyance is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "G".

10    The PDMA is attached to the Complaint in Adversary Proceeding No. 08-5041 as Exhibit "H".

11

ensures repayment to LOH in a timely manner. Section 6 of the PDMA imposes various notice requirements upon ECP regarding the ORRI, stipulates the time and manner of delivery of the ORRI to LOH, and places the costs of delivery on ECP. Section 7 of the PDMA imposes various obligations on ECP with respect to the quality of the ORRI.

Section 9 of the PDMA imposes various obligations on ECP relating to the Properties, including, but not limited to, obligations to keep the leasehold interest in effect, maintain the Properties and related equipment in good condition, notify LOH of any adverse Claims, promptly pay all operating expenses, taxes and other charges, comply with applicable environmental laws, and maintain title to the Properties. Section 11 of the PDMA requires ECP to maintain certain insurance coverages and names LOH as an additional insured. Section 14 of the PDMA requires ECP to provided LOH with financial statements, balance sheets, environmental reports and other extensive reporting statements.

Pursuant to Section 16 of the PDMA, ECP purported to grant LOH a mortgage and security interest in all of its interest in the Properties and all equipment, fixtures, inventory, goods, accounts, contract rights, and general intangibles relating to the Properties. The purpose of the mortgage and security interest contained in Section 16 of the PDMA was purportedly to further secure all of ECP's obligations to LOH, including, but not limited to, its production and payment obligations under the PDMA, the Conveyance Agreement, the Purchase and Sale Agreement, the Contributed Conveyance, and the Purchased Conveyance.

Finally, under the construct set forth in the LLC Agreement, the Debtor is the one hundred percent (100%) membership interest owner of LOH. However, LOH also has an "Independent Member" which is afforded certain powers and responsibilities intended to prevent LOH from entering bankruptcy and to divest the Debtor of control over the ORRI during the term of the financing. For instance, the Independent Member is granted the authority to unilaterally sell the ORRI by private sale, without any benefit of advertisement, notice or appraisement and without resort to judicial process.

Specifically, Section 9(b)(i) of the LLC Agreement describes the Independent Member's primary role, in pertinent part, as follows:

Section 9.    Management

(b)    Limitation on the Company's Activities.

(i)    Notwithstanding the foregoing provisions of Section 9(a), so long as any sum is or may become payable by the Company under the Funding Agreement, the Independent Member shall be entitled, in the name and on behalf of the Company, and without requiring any consent from the Member to (A) following receipt by the Company of an Enforcement Notice from Issuer SPV pursuant to the terms of the Funding Agreement, cause the Company to sell the Overriding Royalties (or any portion thereof specified in the Enforcement

12

Notice) in a commercially reasonable manner and on arms' length terms and conditions consistent with industry practice and, after deducting all costs and expenses incurred by the Independent Member in relation to such sale, cause the proceeds of such sale to be deposited to the Collection Account (as such term is defined in the Funding Agreement) for application in accordance with the terms of the Funding Agreement, and (B) take such steps as the Independent Member may deem appropriate to enforce the rights and obligations of the Company under the Transaction Documents....

Unlike a traditional member-LLC relationship, LOH's Independent Member has fiduciary duties to and serves for the benefit of ECGC and the Sukuk Certificateholders, not the LOH or its sole equity holder. Specifically, the LLC Agreement requires that the Independent Member act, not in the best interest of the company and its members (namely, the Debtor), but rather, that the Independent Member "consider the Interests of **[ECGC] and the holders of the sukuk issued by [ECGC] in connection with all actions taken by the Independent Member pursuant to the Agreement.**"[11]

The LLC Agreement also "closes the loop" on the recourse aspect of the financing transaction by attempting to provide for personal liability on the part of the Debtor, in the form of a mandatory cash capital contribution, in the event that LOH was unable to meet its obligations under the Funding Agreement. Specifically, Section 13 of the LLC Agreement provides:

Section 13. Additional Contributions

(a)...[I]f *at any time* the Company does not have sufficient funds to pay any Funding Return (as such term is defined in the Funding Agreement) due and owing pursuant to the Terms of the Funding Agreement, *[the Debtor] shall be obligated to make additional capital contributions to the Company as may be required to provide the Company with such funds as may be required to pay such Funding Return...*[12]

Section 13 attempts to negate the language in the Purchased Conveyance and the Contributed Conveyance, which suggests a lack of recourse as to the Debtor, by purportedly providing that if the ORRI is insufficient to service the debt under the Funding Agreement, the Debtor must come up with the cash to pay the debt. In other words, Section 13 attempts to hold the Debtor, not LOH, which is purportedly personally liable for the loan. The Debtor intends to object to the validity and allowability of the Claim of LOH under Section 13. Such objection will be filed subsequent to the filing of this Disclosure Statement.

---

11   LLC Agreement, at Section 9(b)(iv) (emphasis added).
12   LLC Agreement, at Section 13(a) (emphasis added).

13

## C. Significant Events Leading to the Filing of the Petition for Relief

Pursuant to the Sukuk Transaction Documents, the Debtor is required to provide a semi-annual reserve report, which is produced by Harper & Associates (Harper Report). Harper delivered the May 2008 report to ECP and Gaffney, Cline & Associates ("GCA"). GCA, the Hydrocarbon Reserves Auditor evaluated the Harper Report and concluded that because ECP had only $6.5 million of capital for operations remaining, there was insufficient capital to perform a majority of the future recompletions of reserves behind pipe. Therefore, the GCA report indicated there were 52.6 BFC's of gas under the assumption that the reserves could not be recovered due to insufficient capital to bring these reserves into production, as per the definition of reserves.

The Sukuk Transaction Documents required the reserves assessment of the Hydrocarbon Reserves Evaluator, Harper, and the Hydrocarbon Reserves Auditor, GCA, to remain within a ten percent (10%) variance. Because GCA wrote down such a significant portion of the proved behind pipe (PBP) reserves, the variance greatly exceeded the allowable tolerance. That variance also arguably created an exogenous event of default which the Debtor had ninety (90) days to cure.

The Debtor received correspondence dated September 17, 2008 issued on behalf of ECGC which alleged the occurrence of an exogenous enforcement event under the Funding Agreement dated July 5, 2006 between ECGC and LOH. The correspondence included a "Notice of Exogenous Enforcement Event," which specified that the failure to cure such event within thirty (30) days of the issuance of the Notice would entitle LOH to issue an Enforcement Notice.

The September 17, 2008 correspondence also included a "Notice of Meeting of Certificate Holders" which provides that the Sukuk Certificateholders would meet in order to authorize ECGC to issue an Enforcement Notice to LOH and take any or all of the following actions:

(a)    waive the Hydrocarbon Mix Shortfall Exogenous Enforcement Event and continue to apply the Payment Schedule;

(b)    declare the funding immediately repayable in full and apply the Accelerated Payment Schedule in lieu of the Payment Schedule;

(c)    require [LOH] to sell all or any interest in the ORRIs as [ECGC] may determine and apply the proceeds of such sale in accordance with the Accelerated Payment Schedule;

(d)    require [LOH] to withdraw any amounts standing to the credit of the Earnout Account and deposit such amounts in the Collection Account for application in accordance with the Accelerated Payment Schedule;

(e)    exercise its rights as a secured party under the Security Documents; and/or

(f)    exercise any other remedies or rights it may have under the Funding Agreement, any Transaction Document, at law or in equity ("Enforcement Options").

14

The Notice of Meeting of Certificate Holders provided that the noticed meeting was to take place on Thursday, October 9, 2008.

Upon information and belief, the meeting of certificate holders did take place on October 9, 2008. Pursuant to the Notice of Exogenous Enforcement Event and the Funding Agreement, East Cameron Gas Company ECGC and LOH would exercise one or more of the Enforcement Options on or after Friday, October 17, 2008. As noted herein above, the Properties constitute the sole source of revenue for ECP and the exercise of Enforcement Options would have rendered ECP incapable of operating its business. Therefore, ECP filed this case on October 16, 2008 in order to protect the estate's substantial Interests in the Properties.

## D. Significant Events During Chapter 11 Proceedings

### 1. Adversary Proceeding No. 08-05041 and Settlement Thereof

Contemporaneously with the filing of the voluntary bankruptcy petition, ECP also filed the Complaint in Adversary Proceeding No. 08-05041 (the "Adversary Proceeding") against LOH, ECGC, and Deutsche Bank Trust Co. Americas ("Deutsche Bank") seeking (a) the issuance of a Temporary Restraining Order and Preliminary Injunction to LOH, ECGC, and Deutsche Bank staying and enjoining with it the selling, monetizing, liquidating, encumbering, conveying, or otherwise transferring the ORRI or exercising any of the Enforcement Options; (b) for declaratory judgment in favor of ECP; or (c) alternatively, for entry of an Order enforcing the automatic stay against the Defendants. Adversary Proceeding No. 08-05041 seeks a declaratory judgment by the Bankruptcy Court that the entire transaction described above, including specifically the Purchase and Sale Agreement, the Contribution Agreement, the Purchased Conveyance, the Contributed Conveyance and the PDMA were simulations designed to constitute a disguised loan and an antichresis under Louisiana law by which actual ownership of the ORRI was never transferred by ECP to LOH. Instead, the ORRI remains an asset of ECP which is subject to a pledge in favor of LOH as security for the loan.

ECP's request for a Temporary Restraining Order was granted by the Bankruptcy Court on October 16, 2008.[13] A hearing was held on November 7, 2008 and the Bankruptcy Court took testimony and evidence regarding ECP's request for preliminary injunction and a motion to intervene in the matter on behalf of the Sukuk Certificateholders.[14] On November 13, 2008, the Bankruptcy Court entered an Order granting the motion to intervene.[15] On November 18, 2008, the Bankruptcy Court entered the requested Preliminary Injunction.[16]

On December 19, 2008, Motions to Dismiss Adversary Proceeding No. 08-05041 were filed on behalf of ECGC, LOH, and the Sukuk Certificateholders.[17] A hearing was held on January 27, 2009 regarding the Motions to Dismiss and the matters were taken under advisement.[18] On March

---

13    *See* Docket No. 3 in Adversary Proceeding. 08-05041
14    *See* Docket No. 43 in Adversary Proceeding No. 08-05041.
15    *See* Docket No. 49 in Adversary Proceeding No. 08-05041.
16    *See* Docket No. 56 in Adversary Proceeding No. 08-05041.
17    *See* Docket Nos. 60, 67, and 70in Adversary Proceeding No. 08-05041.
18    *See* Docket No. 100 in Adversary Proceeding No. 08-05041.

15

24, 2009, the Bankruptcy Court ruled that the Motions to Dismiss would be granted and the Debtor would be permitted to replead the allegations in the Complaint.[19] The Debtor filed its Amended Complaint on April 23, 2009.[20] The Defendants have sought and received by virtue of agreements from the Debtor and orders of the Bankruptcy Court, multiple extensions of time to respond to such Amended Complaint. The extensions were agreed to in order to allow the parties to focus and concentrate their primary efforts on reorganizing the Debtor in the underlying bankruptcy case. The current deadline for the Defendants to answer or otherwise respond to the Amended Complaint is March 31, 2010.

On February 9, 2010, the Debtor filed its *Motion for Approval of a Settlement and Compromise Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "Settlement Motion") (Docket No. 473) seeking the approval of the Court to settle the Adversary Proceeding. Following a hearing on March 11, 2010, the Court orally granted the Settlement Motion, which contemplated, *inter alia*, the payment of Five Hundred Thousand and 0/100 Dollars ($500,000.00) by the Sukuk Certificateholders to the Debtor, the dismissal of the Adversary Proceeding with prejudice, the dissolution of the Preliminary Injunction and the granting of certain releases as set forth in the Settlement Motion and the accompanying Compromise Settlement Agreement and Mutual Release (the "Settlement Agreement"). On April 6, 2010, the Bankruptcy Court entered its Order (Docket No. 542) approving the Settlement Motion and the associated Settlement Agreement.

## 2. Assumption of the Leases with Minerals Management Services

Pursuant to the Debtor's request and an order of the Bankruptcy Court, the Debtor has assumed the oil and gas leases by and between the Debtor and the MMS and relating to the Properties.

## 3. Other Significant Bankruptcy Case Events

The Bankruptcy Court entered Orders authorizing the employment of professionals to act on behalf of ECP. Specifically, in addition to undersigned counsel, the Bankruptcy Court authorized employment of Postlethwaite & Netterville ("P&N") as accountants for the Debtor.[21] P&N has assisted the Debtor and its professionals with the Debtor's accounting and financial recordkeeping, and is responsible for the preparation of the Debtor's required bankruptcy filings.

Additionally, ECP filed an application and the Bankruptcy Court entered an Order on March 24, 2009 authorizing the employment of Global Hunter Securities, LLC as Financial and Restructuring Advisor to assist ECP in efforts to reorganize, locate potential investors, and formulate the Plan.[22]

Finally, following a hearing on May 12, 2009, the Bankruptcy Court authorized the employment of Goldking Capital Management, LLC ("Goldking") as the Debtor's Chief

---

19    *See* Docket No. 123 in Adversary Proceeding No. 08-05041.
20    *See* Docket No. 125 in Adversary Proceeding No. 08-05041.
21    *See* Docket Nos. 37 and 190 in Case No. 08-51207.
22    *See* Docket Nos. 221 and 246 in Case No. 08-51207.

16

Restructuring Officer ("CRO").[23] Pursuant to the Order approving the employment of Goldking as CRO, the terms and scope of Goldking's duties and responsibilities are defined in the Engagement Letter executed by and between the Debtor and Goldking as of May 5, 2009.[24]

A meeting of creditors was held on December 2, 2008 and the Official Committee of Unsecured Creditors (the "Committee") was appointed on December 23, 2008.[25] On February 13, 2009, the Committee filed a Motion to Appoint Examiner.[26] Recently, the Committee amended the Motion to Appoint Examiner to include an additional request for conversion of this Chapter 11 Case to one under Chapter 7 and/or for dismissal.[27] A hearing on the Motion to Appoint Examiner, or alternatively, to Convert/Dismiss has been continued by the Court until June 30, 2009.[28]

## 4. Whitney Bank Wire Transfer Fraud

On or about Wednesday, May 6, 2009, thirteen (13) separate wires were initiated from the operating account held by the Debtor at Whitney National Bank ("Whitney"). The thirteen (13) wires, totaling $95,170.00, were in the following amounts:

1. 11:45:47 AM $6,400.00
2. 11:54:55 AM $7,800.00
3. 11:59:20 AM $4,800.00
4. 12:01:57 PM $6,400.00
5. 12:04:21 PM $9,000.00
6. 12:44:20 PM $6,790.00
7. 12:47:06 PM $4,800.00
8. 12:49:55 PM $8,391.00
9. 12:57:30 PM $9,000.00
10. 1:24:57 PM $7,910.00
11. 1:37:11 PM $ 8,457.00
12. 1:40:37 PM $8,111.00
13. 2:01:49 PM $7,311.00

Shortly after these wires were initiated, Whitney contacted William Fanning at the offices of ECP to verify that the wires were in fact initiated by the Debtor, as Whitney's ongoing practices include the verification of all wires when such wires are made in the same amount by the same customer on a single day. Mr. Fanning immediately refuted that the Debtor had initiated these wires, and Whitney began to investigate the matter.

On Tuesday, May 19, 2009, the Debtor's counsel and the CRO met with John Jones, a Whitney Vice President, at Whitney's Houston, Texas offices to discuss the wire transfer fraud,

---

23  See Docket No. 283 in Case No. 08-51207.
24  See Exhibit "A" to Docket No. 295 in Case No. 08-51207.
25  See Docket Nos. 108 and 115 in Case No. 08-51207.
26  See Docket No. 176 in Case No. 08-51207.
27  See Docket No. 275 in Case No. 08-51207.
28  See Docket No. 288 in Case No. 08-51207.

and to discuss opening additional bank accounts. At that time, Jones informed the Debtor's counsel and the CRO that Whitney's security department was working with the banks that received the various wire transfers, as well as with the FBI and the Treasury Department to recover the funds. To date, Whitney has recovered $69,003.00, and has informed the Debtor that it will be unable to recover the remaining amounts, resulting in a net loss to the Debtor's Estate of $26,167.00.

### 5. Sale of Certain of the Debtor's Assets

On February 9, 2010, the Debtor filed its *Motion, Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code And Bankruptcy Rules 2002, 6004, 6006, 9007 And 9014, For Entry Of: (I) An Order (A) Approving The Asset Purchase Agreement By And Between The Debtor And Cheyne Special Situations Fund LP, Cheyne Vista Fund LP, Dupont Pension Trust, Camulos Master Fund LP And Plainfield Direct Inc., (B) Authorizing The Sale Of Certain Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests, (C) Authorizing The Rejection And Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection Therewith And (D) Granting Related Relief; Or (II) An Order (A) Approving Bidding Procedures And Overbid Protections In Connection With The Sale Of Certain Of The Debtor's Assets, (B) Scheduling An Auction, (C) Scheduling A Sale Hearing To Consider Approval Of An Asset Purchase Agreement Between The Debtor And The Winning Bidder At The Auction And (D) Granting Related Relief* ("the "Sale Motion") (Docket No. 471). Under the Sale Motion, the Debtor sought approval of the Bankruptcy Court to sell certain assets (the "Acquired Assets"), including, but not limited to, the Debtor's interest in the Properties, to certain of the Sukuk Certificateholders (the "Buyers"). The Sale Motion further sought specific approval of the terms of an Asset Purchase Agreement by and between the Debtor and the Buyers (the "APA"), a copy of which is attached to the Sale Motion as Exhibit A, and which terms are summarized as follows:

| Seller (APA p.1) | East Cameron Partners, LP |
|---|---|
| Buyers (APA p.1) | Cheyne Special Situations Fund LP, Cheyne Vista Fund LP, Dupont Pension Trust, Camulos Master Fund LP and Plainfield Direct Inc., or their assignee(s) or designee(s). |
| Purchase Price (APA § 6) | The Purchase Price for the Acquired Assets shall be (i) a credit bid, pursuant to section 363(k) of the Bankruptcy Code, in the amount of Four Million Dollars and 00/100 Cents ($4,000,000.00) and (ii) the aggregate amount of the Assumed Liabilities set forth on Schedule 3 to the APA. |
| Transfer of the Acquired Assets (APA § 1(a)) | Upon and subject to the terms and conditions of this Agreement, at the Closing, Seller shall, pursuant to Sections 363 and 365 of the Bankruptcy Code, sell, assign, transfer, convey and deliver, to the extent transferable, to Buyer, free and clear of all Liens (other than Liens associated with Assumed Liabilities), and Buyer shall purchase, and take assignment and delivery of, all right, title and interest in and to all of the assets, properties, goodwill and business of every kind and description and wherever located, whether tangible or intangible, personal or mixed, directly or indirectly owned by Seller or to which it is directly or indirectly entitled and, in any case, belonging to or used or intended to be used in the Business, other than the Excluded Assets, as defined in Section |

18

| | |
|---|---|
| | 2, including, by way of illustration and without limitation, the following assets, properties and rights of Seller, other than Excluded Assets. |
| **Acquired Assets (APA § 1)** | The Acquired Assets shall include, except for the Excluded Assets, all rights, title and interest in the assets of the Debtor, including but not limited to, the following: (i) all of Seller's right, title and interest in and to any inventory, including, without limitation, products, works in process, processed parts, finished goods (including goods in transit), raw materials, supplies, and components intended for sale (the "Inventory"); (ii) all of Seller's right, title and interest in and to any and all wells, equipment, facilities, tools, equipment (including office equipment, computers and telephone equipment), vehicles and other tangible personal property that is used, held for use or intended for use or useful in or attributable to the Business, or which is being utilized or operated by Seller, including all oil and/or gas wells, pumps, platforms, well equipment (surface and subsurface), saltwater disposal wells, water wells, lines and facilities, sulfur recovery facilities, compressors, compressor stations, dehydration facilities, treatment facilities, pipelines, gathering lines, flow lines, transportation lines, valves, meters, separators, tanks, tank batteries, and other fixtures, office equipment, computers, and telephone and other communications equipment (the "Equipment"); (iii) all of Seller's right, title and interest in, under and to any and all (1) unexpired oil, gas and/or mineral leases (including the East Cameron Block 71 Lease and the East Cameron Block 72 Lease), together with all interest derived from such leases in or to any pools or units which include any lands covered by any such leases or all or a part of any such leases, and including all interest derived from such leases in production from any such pooled area or unit, whether such pooled area or unit production comes from wells located on or off of such leases, and all tenements, hereditaments and appurtenances belonging to such leases and such pooled areas or units and (2) unexpired leases (including all rights of Seller under any real property leases relating to any and all facilities used by Seller in the Business and all leasehold improvements, machinery, fixtures and furnishings at any premises covered by such real property leases) or executory contracts (as those terms are used in Section 365 of the Bankruptcy Code) to which Seller is a party or holds record title, operating rights or any other legal or beneficial interest (the "Contracts") and listed in Schedule 1(iii) (the "Assigned Contracts"); (iv) all of Seller's license and sublicense agreements (the "Licenses"); (v) all of Seller's right, title and interest in, to and under all Intellectual Property owned, licensed or sublicensed by or to Seller and all of Seller's rights to income or royalties attributable to the Intellectual Property; (vi) all insurance claims (the "Insurance Claims"); (vii) all of Seller's right and interest relating to prepaid expenses, advance payments and deposits related to the Acquired Assets; (viii) all accounts receivable, notes, evidences of indebtedness and other amounts receivable, including those from employees, and from third parties arising from the conduct of the Business, whether or not in the ordinary course of business, together with any unpaid financing charges thereon, and all amounts which have been earned by Seller but which have not yet been invoiced together with the |

right to collect all such amounts; (ix) all franchises, permits, licenses, agreements, consents, waivers and authorizations issued by any Governmental Entity held or used by Seller in connection with, or required for, the Business; (x) books, records and files related to the Acquired Assets, including lease files, land files, well files, gas and oil sales contract files, gas processing files, division order files, abstracts, title opinions, land surveys, cores, logs, well-bore evaluation data and reports, geological and geophysical information and data (including all seismic data and reprocessed data), interpretive data, technical evaluations, technical outputs, studies, maps, engineering data and reports, production records, reserve studies and evaluations, operational files (including maintenance, repair and replacement files), customer lists, invoices, shipping records, supplier lists, equipment maintenance data sales and sales promotional data and materials, cost and pricing information, quality control records and manuals, blueprints, research and development files, records and laboratory books, patent disclosures, credit records, drawings, correspondence, other records and data, and all computer software and programs and any rights thereto that are used in, or relating to, the Business; provided, however, that Buyer shall arrange to make copies of any books and records requested by Seller as necessary to administer its Bankruptcy Case, in accordance with Section 12(i); (xi) except for the Excluded Assets in Section 2, all claims, causes of action, rights of recovery and rights of setoff and recoupment of any kind (including rights to insurance proceeds and rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof), pertaining to, arising out of, and inuring to the benefit of Seller relating to the Business or the Acquired Assets, including without limitation, all claims, causes of action, rights of recovery and rights of setoff and recoupment of any kind related to the Seismic Data or the Other Lease Rights; (xii) all of Seller's promotional and advertising materials relating to the Business, including all catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, equipment and parts lists, and dealer and distributor lists; (xiii)all of Seller's rights to tax refunds, rebates, credits and similar items relating to any period or portion of a period ending on or before the Closing Date; (xiv) all of Seller's rights to telephone numbers used in the Business; (xv) any and all goodwill of Seller relating to the Business; (xvi) Hydrocarbons produced, separated, extracted or processed from or attributable to the Acquired Assets; (xvii) all of Seller's right, title and interest in, under and to any and all unexpired easements, permits, licenses, servitudes, rights-of-way, surface or seabed leases and other surface or seabed rights appurtenant to, and used or held for use or useful in connection with the Acquired Assets; (xviii) all of Seller's right and title to that certain escrow account No. 75-9209-02-6 held by the Seller at Capital One Bank, which is pledged to RLI Insurance Company (the "P&A Escrow Account"); and (xix) to the extent not otherwise described above, all of Seller's right, title and interest in, to and under all other assets, rights and claims of every kind and nature used or intended to be used or useful in the operation of, or residing with, the Business.

20

| | |
|---|---|
| **Excluded Assets (APA § 2)** | Seller is not selling, assigning, transferring, conveying or delivering to Buyer, and Buyer is not purchasing, and the term "Acquired Assets" does not include, any interest in and to the following (collectively, the "Excluded Assets"): (a) cash; (b) corporate books and records of Seller, including Seller's organization documents, minute and stock record books and bank records; (c) causes of action and equitable rights and remedies arising under Sections 544 through 552 of the Bankruptcy Code; provided, however, as set forth in Section 1(a)(xi), the Buyer is purchasing all causes of action and equitable rights and remedies arising under Sections 544 through 552 of the Bankruptcy Code related to the Seismic Data or the Other Lease Rights; (d) rights, title and interest of Seller in and to all Contracts that are not Assigned Contracts; (e) rights to any unused portion of retainers for Seller's professional advisors retained under sections 328 and 330 of the Bankruptcy Code; (f) any ownership interest held by Seller in Louisiana Offshore Holding, LLC, a Delaware limited liability company ("LOH"), or any other Person; (g) all bank accounts of Seller; provided, however, Buyer is purchasing all of the Seller's right, title and interest to the P&A Escrow Account, (h) any contracts or agreements to operate the East Cameron Block 71 Lease and the East Cameron Block 72 Lease and (i) all assets designated by Buyer and set forth on Schedule 2 to the APA to which Seller is a party (the "Designated Excluded Assets"). |
| **Assigned Contracts (APA § 8)** | Seller shall assume, and assign to Buyers, the Assigned Contracts. Seller shall also assume, and assign to Buyers, any other Contracts related to the Business and designated by Buyers, in their sole discretion and by written notice to Seller, for assumption and assignment at any time and from time to time after the date hereof and prior to the entry of an order rejecting such Contract pursuant to Section 365(a) of the Bankruptcy Code as provided in the Sale Order (such additional designated contracts are also Assigned Contracts). Buyers shall have the sole discretion to remove any Assumed Contract previously designated for assumption and assignment, at any time and from time to time prior to the effective date of the assumption by Seller of such Contract. Prior to the Closing, Seller shall not reject any Contract without providing Buyers (i) prior written notice of its intent to reject such Contract, (ii) a copy of such Contract, and (iii) the prior opportunity to designate such Contract as an Assumed Contract. |
| **Assumed Liabilities (APA § 3)** | Buyers expressly agree to assume at Closing (a) the Liabilities of Seller set forth in Schedule 3 and (b) any liabilities under the Assigned Contracts and the Cure Amounts as provided and defined in Sections 8(d) and 8(e) of the APA (collectively, the "Assumed Liabilities"). The Liabilities set forth on Schedule 3 are: (i) Any and all outstanding and remaining prepetition and postpetition liabilities and obligations of the Debtor to the United States Department of the Interior, Minerals Management Service; (ii) Any administrative claims of Global Hunter Securities through the Closing Date; (iii) Any outstanding post-petition payables owed to trade vendors through the Closing Date; (iv) Any obligations and liabilities as to the Seller's bonding company, RLI Insurance Company; and (v) Production, Delivery and Marketing Agreement, dated July 5, 2006, by and between Seller and LOH. |

21

| | |
|---|---|
| **Excluded Liabilities** (APA § 4) | Except for the Assumed Liabilities, Buyers shall not assume or agree to pay, perform or discharge, any Liabilities of Seller or become liable to Seller or any other person or legal entity or organization, for any Liabilities of Seller (the "Excluded Liabilities"). |
| **Break-Up Fee** (APA § 15(b) and 18(b)) | In the event that Seller consummates an Alternate Transaction or the Bankruptcy Court enters an order approving an Alternate Transaction, and that Alternate Transaction is consummated, Buyers shall be entitled to the Buyer Protection Payment, which shall immediately be due and payable by Seller upon the consummation of the Alternate Transaction. Once earned, the Buyer Protection Payment shall be allowed as a secured claim against the proceeds of the Alternate Transaction, and payable to Buyers, without necessity of any further order of the Bankruptcy Court. The Buyer Protection Payment shall have priority over any and all administrative expenses of the kinds specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code, and shall for all purposes be *pari passu* or otherwise on equal priority with the Liens granted in the Final DIP Order entered in the Bankruptcy Case. "Buyer Protection Payment" means a break-up fee in the amount of $100,000.00. |
| **Closing Date** (APA § 7) | Unless otherwise agreed in writing by Seller and Buyers, the closing and consummation of the Transaction (the "Closing") shall take place at a time and date of Buyers' choosing on or before March 8, 2010 (the "Closing Date") at the offices of Seller's counsel. |
| **Termination Provisions** (APA § 15(a)) | This Agreement may be terminated at any time prior to the Closing: (i) by the mutual written consent of Buyers and Seller; (ii) by Seller, upon a material breach by Buyers of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured on the earlier of (A) within 10 days after delivery of written notice thereof, and (B) the Closing Date; (iii) by Buyers, upon a material breach by Seller of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured on the earlier of (A) within 10 days after written notice thereof, and (B) the Closing Date; (iv) by Buyers, if the Bankruptcy Case is converted to a chapter 7 case under the Bankruptcy Code; (v) by Buyers or Seller if any court of competent jurisdiction or other Governmental Entity shall have issued, enacted, entered, promulgated or enforced any order, judgment, decree, injunction or ruling which restrains, enjoins or otherwise prohibits the Transaction and such order, judgment, decree, injunction or ruling shall have become final and non-appealable; and (vi) by Buyers or Seller if the Closing shall not have occurred on or before March 8, 2010. |

On March 31, 2010, the Bankruptcy Court entered its Order approving and Sale Motion and the associated APA, and granting the Debtor's request to reject certain executory contracts and unexpired leases, and to assume and assign certain executory contracts and unexpired leases to the Buyers. As of the filing of the Plan and this Disclosure Statement, the Debtor and Buyers are working diligently toward a projected Closing Date of April 15, 2010. To the extent that the Buyers have not been qualified by the MMS to operate an offshore lease, the Buyers may extend the Closing Date to

any date of the Buyer's choosing that is not later than May 15, 2010 and is not later than three (3) business days after Buyer's qualification with the MMS.

### E. Partners of the Debtor

ECP is a limited partnership currently consisting of a general partner and four (4) limited partners. The identity, nature, and percentage interest of each of the partners in ECP is as follows:

| Name of Partner | Nature of Partnership | Percentage of Partnership Interest |
|---|---|---|
| Open Choke Energy, LLC | General Partner | 1.0% |
| OCEI Minerals, Ltd. | Limited Partner | 28.44% |
| OCEI Royalty, Ltd. | Limited Partner | 2.0% |
| Open Choke Energy Advisors, LLC | Limited Partner | 33.0% |
| Open Choke Energy Partners, LLC | Limited Partner | 35.56% |

### F. Management of the Debtor

#### 1. Management of the Debtor Prior to Appointment of the CRO

Prior to the appointment of Goldking as CRO for the Debtor, and the resulting management and control of the Debtor by and through the CRO, ECP was managed by its general partner, Open Choke Energy, LLC. Campbell Evans ("Evans") is the managing member of Open Choke Energy, LLC ("OCE"), the general partner of ECP. Since 1985, Evans has also served as the President of BT Operating Company ("BTO"). BTO filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code in May 2002, successfully reorganized, and obtained confirmation of its Plan of Reorganization in May 2003. From 1973 to 1983, Evans worked for Marine Contractors and Supply, where he was actively engaged in all facets of exploration and production in the oil and gas business. Evans holds a bachelors degree in Journalism from the University of Texas at Austin.

Mr. William Fanning ("Fanning") is Vice President and Treasurer of OCE. Since 1996, Fanning has also served as the Director of Corporate Accounting for BTO. From 1989 until 1996, Fanning held different positions with the following companies: Biological Solutions USA, Inc., Garden Ridge Pottery, Pennzoil, Inc., J. Herrington & Co., CPA, and Kimmins Industrial Service Corporation. Fanning is presently affiliated with the American Institute of Certified Public Accountants - Houston Chapter, Texas Society of Certified Public Accountants, and Petroleum Accounting Society of Houston. Fanning holds a B.B.A. in Accounting from the University of Texas at Austin.

23

## 2. Management of the Debtor Following Appointment of the CRO

Following the appointment of Goldking as CRO, the Debtor is being controlled and managed by and through Goldking and its principal, Leonard Tallerine, Jr. ("Tallerine").

Goldking, including its affiliates and predecessor entities, has been a successful oil and gas exploration and production company since it was formed in 1968. When acquired by Mr. Tallerine in 1991, Goldking operated over 420 wells, principally on the Texas and Louisiana Gulf Coast.

Mr. Tallerine is a graduate of Rice University and the University of Houston. Mr. Tallerine also is a graduate of Rice University's Economics/Advanced Management Institute, and has completed the University of Texas at Austin Continuing Studies Program on Reservoir Engineering. Mr. Tallerine began his career as a CPA in the Houston, New York and Washington, D.C. offices of Price Waterhouse and KMPG from 1972 through 1980. From 1981 to 1986, Mr. Tallerine served as co-managing general partner of PGI, Ltd., the Dr. Michael E. DeBakey Family Partnership involved in oil, gas, and real estate investments.

From 1986 to 1991, Mr. Tallerine was an independent oil and gas producer. In 1991, Mr. Tallerine acquired Goldking. As the company's sole shareholder and Chief Executive Officer, Mr. Tallerine reorganized and significantly expanded the Goldking's asset base, and in July 1997 sold the company to Panaco (AMEX:PNO) for $43.8 million, a return on equity of $27.8 million.

Beginning in 1998, Mr. Tallerine again built an oil and gas enterprise which he later sold to GulfWest Energy, now Crimson Exploration (OTC:CXPO), and to White Oak Energy in a series of transactions between 2001 and 2003, for a return on equity of $8.9 million.

Beginning in July 2004, with National Gas Partners as an equity partner, Mr. Tallerine again built Goldking. In May 2007, Goldking was sold to Dune Energy (AMEX:DNE) for $310.5 million in cash and $18.0 million in Dune common stock, plus additional consideration in the form of an overriding interest. This sale resulted in a return on equity of $147.65 million.

In the Dune transaction, Mr. Tallerine retained the Goldking name and subsequent to the sale, re-established Goldking to continue pursuing opportunities on the oil and gas industry, which includes assembling a portfolio of oil and gas properties and mineral Interests. In 2008, Goldking and its partners spent over $76,000,000 to purchase oil and gas assets, and sold over $12,000,000 of previously owned mineral assets. Goldking's ownership of perpetual mineral Interests constitutes a permanent asset base, and includes Interests in 259 counties across the U.S. and producing wells 21 states.

## III. DESCRIPTION OF THE PLAN

### A. Summary of the Plan

The entire text of the Plan has been provided, with this Disclosure Statement, to all Holders of Claims and Interests known to the Debtor. The Plan is the operative controlling legal document and, therefore, should be read carefully and independently of this Disclosure Statement. Creditors,

Claimants, and other Holders of Claims and Interests, are further urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan.

Subject to the foregoing limitations, the Plan proposes to classify all Claims and Interests in and against the Debtor as Administrative Claims, Priority Tax Claims, and into five (5) separate voting classes. The treatment of each of these categories and classes of Claims is discussed in more detail below and in Articles III and IV the Plan.

The Plan will be compliant with the priority scheme of the Bankruptcy Code. The purpose and effect of the Plan is to, *inter alia*, (a) provide for the creation of a Liquidation Trust which shall receive Six Hundred and Fifty Thousand and 0/100 Dollars ($650,000.00) to satisfy remaining paid and unpaid Administrative Claims, to make Distributions and pay certain of the fees and expenses of the Liquidating Trustee and its professionals for administering the Liquidating Trust and prosecuting Causes of Action that are vested in the Liquidating Trust in accordance with the Plan (b) the Liquidation Trust shall be primarily responsible for prosecuting assigned Causes of Action, analyzing and objecting, if necessary, to Claims asserted by Creditors in the Debtor's Bankruptcy Case, (c) the Debtor shall assign all Causes of Action belonging to the Debtor's Estate (excluding the two causes of action sold and assigned to the Sukuk Certificateholders in connection with the Sale Motion), including, but not limited to, all actions existing under Chapter 5 of the Bankruptcy Code to a Liquidation Trust, to be prosecuted and collected for the benefit of the Holders of General Unsecured Claims, and (d) the Liquidation Trust shall distribute all Cash held by the Debtor as of the Effective Date of the Plan to the Holders of allowed Administrative Claims (except those Administrative Claims specifically assumed and to be paid by the Buyers in connection with the Sale Motion and Sale Order. The Liquidating Trustee shall be Paul DeBaillon. It is estimated that the cost of the Trustee will be Fifty Thousand and 0/100 Dollars ($50,000.00) during the term of the Trust and One Hundred Thousand and 0/100 Dollars ($100,000.00) for professional fees and costs for the professionals selected by the Trustee.

On the Effective Date, except as otherwise provided for herein, (i) the Debtor Interests shall be deemed extinguished, cancelled and of no further force or effect, and (ii) the obligations of the Debtor (and the Reorganized Debtor) under any agreements governing the Debtor Interests and any indebtedness or obligation of the Debtor with respect to the Debtor Interests shall be discharged without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person.

## B.    Unclassified Claims

### 1.    Administrative Claims

Except with regard to those Administrative Claims assumed by the Buyers in connection with the Sale Motion and Sale Order, the Plan provides that unless the Holder of an Administrative Claim agrees to different treatment, each Holder of an Administrative Claim that is or becomes an Allowed Claim shall be paid in full, in Cash, on the Effective Date or the date that an Administrative Claim becomes an Allowed Administrative Claim. As of the Effective Date, the Debtor projects that there may be future potential Administrative Claims, other than those Administrative Claims to be paid directly by the Buyers under the Sale Order, through the contemplated Effective Date of

25

approximately Two Hundred Thousand and 0/100 Dollars ($200,000.00), inclusive Professional Claims. In connection with the Plan, the Debtor is seeking to set an Administrative Claims Bar Date of thirty (30) days after the occurrence of the Effective Date. The Interests of Holders of Administrative Claims are not Impaired pursuant to the Plan and are not entitled to vote to accept or reject the Plan.

### 2. Professional Fee Claims

All Professionals seeking payment of an Administrative Claim pursuant to an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under Sections 503(b)(2), 503(b)(3) or 503(b)(4) of the Bankruptcy Code shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days of the occurrence of the Effective Date. If granted, such an award by the Bankruptcy Court shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon between the Holder of an Administrative Claim and the Debtor or, on and after the Effective Date, the Liquidating Trustee.

### 3. Priority Tax Claims

The Plan provides that unless the Holder of a Priority Tax Claim agrees to different treatment, each Holder of a Priority Tax Claim that is or becomes an Allowed Priority Claim shall be paid the total amount of such Claim in full in equal quarterly installments beginning on the Initial Distribution Date in deferred cash payments over a period not exceeding five (5) years after the Petition Date with interest. The Debtor believes that there will be no Priority Tax Claims against the Debtor's Estate as of the Effective Date. The rights and Interests of Holders of Priority Claims are not Impaired pursuant to the Plan and are not entitled to vote to accept or reject the Plan.

### C. Classification and Treatment of Claims and Interests

### 1. Class 1: Other Priority Claim

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the Debtor and such holder shall have agreed upon in writing; *provided*, that such treatment is on more favorable terms to the Debtor (or the Reorganized Debtor after the Effective Date), than the treatment set forth in clause (A) above.

The Debtor has conducted a preliminary investigation, and has determined that as of the date of the submission of this Disclosure Statement, the Debtor is not aware of the existence of any such Claims. However, out of an abundance of caution, the Debtor has included and provided treatment

26

for this potential Class of Claims. Because it is not aware of the existence of any such Claims, the Debtor cannot provide any estimate of the total value of the Other Priority Claims.

To the extent that any Class 1 Other Priority Claims exist, the rights and Interests of Holders of Other Priority Claims are Impaired pursuant to the Plan and are entitled to vote to accept or reject the Plan.

### 2. Class 2: Secured Claim

The Holders of Allowed Secured Claims in Class 2 will receive, at the election of the Debtor, either (i) the legal, equitable, and contractual rights of each holder of an Secured Claim will be Reinstated or (ii) each holder of an Secured Claim shall receive treatment so as to render Unimpaired such Secured Claim.

The Debtor has conducted a preliminary investigation regarding whether there are any Holders of Claims which are secured by any Lien or allegedly secured by any asserted or unasserted lien against the Properties or other Assets of the Debtor. As of the date of the submission of this Disclosure Statement, the Debtor is not aware of the existence of any such Claims. However, out of an abundance of caution, and given the nature of any such potential Lien Claims, the Debtor has included and provided treatment for this potential Class of Claims. Because it is not aware of the existence of any such Claims, the Debtor can not provide any estimate of the total value of the Secured Claims.

To the extent that any Class 2 Secured Claims exist, the rights and Interests of Holders of Secured Claims are Impaired pursuant to the Plan and are entitled to vote to accept or reject the Plan.

### 3. Class 3: General Unsecured Claims

Each Holder of a General Unsecured Claim that is not Subordinated Unsecured Claims will receive its Pro Rata share of Distributions in accordance with Section 6.3(C) of the Plan, in full discharge of, in exchange for, and on account of such Allowed Claim, to be made from the Liquidating Trust to be established pursuant to Section 5.2 of the Plan as of the Effective Date.

The rights and Interests of Holders of General Unsecured Claims in Classes 3 are Impaired pursuant to the Plan and are entitled to vote to accept or reject the Plan.

### 4. Class 4: Subordinated Unsecured Claims

Under the Plan, Subordinated Unsecured Claims will not receive or retain any property on account of such Claims. All Subordinated Unsecured Claims will be discharged as of the Effective Date.

Holders of Class 4 Claims are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, such Holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

27

5. **Class 5: Existing Debtor Interests**

Under the Plan, All Debtor Interests shall be cancelled as of the Effective Date and the holders thereof shall not receive or retain any property under the Plan on account of such Debtor Interests.

Holders of Class 5 Debtor Interests Claims are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, such Holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

D. **Means of Implementation of the Plan**

1. **Creation of Liquidating Trust and Appointment of Liquidating Trustee.**

(a) **Establishment of the Liquidating Trust.** On the Effective Date, the Debtor on its own behalf and on behalf of the Holders of Allowed Claims shall execute the Liquidating Trust Agreement, a copy of which is attached to the Plan as Exhibit A, and shall take all other steps necessary to establish the Liquidating Trust. The Confirmation Order shall include and constitute approval of the Liquidating Trust Agreement and authorization of the Debtor to execute the Liquidating Trust Agreement.

(b) **Purpose of the Liquidating Trust.** The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Trust Assets, in accordance with Treasury Regulation Section 301.701-4(d), with no object to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the Internal Revenue Service (the "IRS"), all parties shall treat the Liquidating Trust as a liquidating trust for income tax purposes.

(c) **Transfer of Trust Assets by Debtor to the Liquidating Trust.** Upon the Effective Date but subsequent to the execution of the Liquidating Trust Agreement, any and all property of the Debtor's Estate shall be transferred and vested in the Liquidating Trust, free and clear of any and all Claims, Interests, debts, Liens, security Interests, and encumbrances of any kind or type, except those Claims, debts, Liens, security Interests, and encumbrances specifically provided for under the Plan.

(d) **Appointment of the Liquidating Trustee.** On the Effective Date, Paul DeBaillon, or such other individual or entity designated by the Debtor at the Confirmation Hearing, or any other individual or entity approved by the Bankruptcy Court, shall be appointed as the Liquidating Trustee under the Plan. Any successor Liquidating Trustee shall be appointed as set forth below. The Liquidating Trustee's powers, duties, bonding requirements and compensation shall be set forth in the Liquidating Trust Agreement, a copy of which is attached to the Plan as Exhibit A.

(e) **Successor Liquidating Trustee(s).** The Liquidating Trustee shall appoint any successor(s) to the Liquidating Trustee after application to and approval by the

28

Bankruptcy Court.

(f) **Powers and Duties of the Liquidating Trustee.** The Liquidating Trustee shall have the rights and powers of a debtor-in-possession under Section 1107 of the Bankruptcy Code (including specifically the same duties owed by the Debtor to both Holders of Claims and Interests), the rights and powers as set forth in the Liquidating Trust Agreement, and such other rights, powers and duties incident to causing the performance of the Debtor's obligations under the Plan, including, without limitation, (i) the duty to assess the merits of Claims and object to those Claims that the Liquidating Trustee determines to be, in whole or in part, without merit, to prosecute such objections and defend Claims and counterclaims asserted in connection therewith, to transfer any residual, (ii) to file and prosecute any and all Causes of Action, including, but not limited to, the Avoidance Claims (set forth on Exhibit 2 to this Disclosure Statement), Cedar Claims, Affiliate Claims and the Whitney Bank Wire Transfer Fraud Claims (all as defined hereinbelow), (iii) to make the Distributions provided in the Plan including Distributions to Holders of General Unsecured Claims in Class 3, and (iv) such other duties as are necessary to effectuate the terms and provisions of the Plan. A copy of the Debtor's books and records will be delivered to the Liquidating Trustee as agent for the Liquidating Trust on or promptly following the Effective Date.

(g) **Payment of Fees and Expenses of the Liquidating Trustee.** The compensation to be paid to the Liquidating Trustee and any and all professionals retained by the Liquidating Trustee shall generally comport with the customary and reasonable professional compensation payable in this district in accordance with Section 330 of the Bankruptcy Code. However, the payment of fees and expenses to the Liquidating Trustee and its professionals shall not require the approval of the Bankruptcy Court. As soon as practicable after the Effective Date, the Reorganized Debtor shall transfer to the Litigation Trust Six Hundred and Fifty Thousand and 0/100 Dollars ($650,000.00) to satisfy remaining paid and unpaid Administrative Claims, to make Distributions and pay certain of the fees and expenses of the Liquidating Trustee and its professionals for administering the Liquidating Trust and prosecuting Causes of Action that are vested in the Liquidating Trust in accordance with the Plan. The Litigation Trustee may be able to supplement these monies through settlement payments and the collection of judgments.

(h) **Liability.** The Liquidating Trustee shall have no liability for any of its acts or omissions in any case whatsoever arising in connection with the activities of the Liquidating Trustee as provided for under the Plan unless it shall have been guilty of fraud, willful misconduct or gross negligence. The Liquidating Trustee and its professionals shall be indemnified by the Liquidating Trust for any Claims or Causes of Action arising from or relating to the exercise of its duties unless it shall have been guilty of fraud, willful misconduct or gross negligence. In performing its duties hereunder, the Liquidating Trustee may consult with counsel. None of the provisions of the Plan shall require the Liquidating Trustee to expend or risk its own funds or

29

otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any rights and powers. The Liquidating Trustee may rely without inquiry upon any writing delivered hereunder which it believes in good faith to be genuine and to have been given by a proper person.

(i)     **Termination of Liquidating Trust and Liquidating Trustee.** The Liquidating Trust shall terminate no later than the third (3rd) anniversary of the Effective Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, including the Liquidating Trustee, may extend the term of the Liquidating Trust, upon notice to all interested parties and upon a showing that such an extension is necessary to complete the liquidation of the Trust Assets. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is requested at least three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) for federal income tax purposes. Furthermore, the Liquidating Trustee shall further cause the Liquidating Trust to be terminated within three (3) months of the occurrence of the later of (i) the entry of a Final Order by the Bankruptcy Court closing the Chapter 11 Cases pursuant to Section 350(a) of the Bankruptcy Code, or (ii) the final Distribution of all Cash, or (iii) all Adversary Proceedings or litigation of Causes of Action, objections to Claims, and Avoidance Claims, if any, have been litigated and a Final Order has been entered and all proceeds of such litigation have been received and Distributed pursuant to the terms of the Plan.

2.     **Conditions Precedent to Confirmation and Effectiveness of Plan and Waiver and Timing of Same**

The Plan will not be confirmed unless and until the Bankruptcy Court enters (a) an order finding that this Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered, and (b) the Confirmation Order has been entered by the Bankruptcy Court. Unless otherwise agreed, or determined by the Bankruptcy Court, the Confirmation Order shall have the provisions and make the findings indicated in the Plan.

The Plan, however, will not be effective and the Effective Date will not have occurred until the events have occurred:

(a)     the Confirmation Order shall: (i) have been entered by the Bankruptcy Court and have become a Final Order; (ii) be in form and substance satisfactory to the Debtor and shall specifically approve the terms of the Liquidating Trust Agreement and shall authorize the execution thereof by the Debtor and approve the appointment of the Liquidating Trustee; (iii) provide that the Debtor, Reorganized Debtor and the Liquidating Trustee are authorized and directed to take all actions necessary or

30

appropriate to enter into, implement and consummate any and all contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan, including the execution of the Liquidating Trust Agreement; and (iv) provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

**(b)**     the Liquidating Trust Agreement shall be executed;

**(c)**     all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained;

**(d)**     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### 3.     Payment to Administrative Claimants

In connection with the approval of the Sale Motion and the Sale contemplated therein, the Buyers have agreed to assume and all Administrative Claims to the extent that such claims arise prior to the Closing Date of the Sale. As of the Effective Date, the Debtor projects that there may be future post-Closing Date Administrative Claims, other than those Administrative Claims to be paid directly by the Buyers under the Sale Order, of approximately Two Hundred Thousand and 0/100 Dollars ($200,000.00), inclusive of Professional Claims and potential Administrative Claims by other parties, and that the Debtor and/or the Liquidating Trustee will have sufficient cash on hand to fund payments required to be made to Administrative Claimants under the Plan.

### 4.     Payment or Satisfaction of Claims in Classes 1, 2 and 3

Payment of Allowed Other Priority Claims, Secured Claims and General Unsecured Claims will be made by the Liquidating Trustee from available Cash and any additional funds obtained by the Liquidating Trustee through its efforts in prosecuting the Causes of Action vested in the Liquidating Trust in accordance with the terms of the Plan.

### E.     Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code generally gives a debtor the ability, subject to approval of the Bankruptcy Court, to assume or reject Executory Contracts and Unexpired Leases before the confirmation of a plan of reorganization. An Executory Contract or Unexpired Lease may be assumed or rejected either through a plan of reorganization or by order of the Bankruptcy Court on motion, after notice and hearing. Following a debtor's rejection of an Executory Contract or Unexpired Lease, the Bankruptcy Court grants the other party to the contract or lease a limited period in which to file a proof of claim for any damages incurred because of the rejection. To assume an Executory Contract or Unexpired Lease, the Bankruptcy Code requires a debtor to promptly cure existing defaults, with certain limitations, and provide adequate assurance of future performance of its obligations under the Executory Contract or Unexpired Lease.

31

Under the Plan, on the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected, pursuant to Section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date.

Pursuant to Section 7.2 of the Plan, all Claims arising from the rejection of an Executory Contract or Unexpired Lease under Section 7.1 of the Plan, if any, shall be evidenced by the filing of a properly executed Proof of Claim form filed with the Bankruptcy Court within the earlier of thirty (30) days of notice of entry of the Confirmation Order approving the rejection of such Executory Contract and Unexpired Lease (the "Bar Date for Rejection Damages"). Failure to file a Proof of Claim on or before such deadline shall result in disallowance in full of any such Claim and the holder of such Claim shall be forever barred from asserting such Claim against the Debtor, Reorganized Debtor, and the Liquidating Trustee and their respective successors and assets and properties. For the avoidance of doubt, the Bar Date for Rejection Damages set forth in Section 7.2 of the Plan is not applicable to any Claim for rejection damages arising out of an Executory Contract or unexpired leases previously rejected in accordance with an order of the Bankruptcy Court.

## F.     Release, Discharge, Injunction, and Exculpation

### 1.     Release by the Debtor

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, the Liquidating Trustee and any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, any successor to the Debtor or the Debtor's Estate or any Estate Representative, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever, including for negligence, but excluding for fraud, willful misconduct, intentional tortious acts or gross negligence in connection with or related to the Debtor, the Chapter 11 Case, or the Plan (other than the rights of the Debtor, the Reorganized Debtor or any Estate Representative to enforce the Plan and the contracts, instruments, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtor, the Estate, the Reorganized Debtor, the Liquidating Trustee or any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, an Estate Representative, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, the Reorganized Debtor, the Liquidating Trustee or any Person seeking to exercise the rights of the Debtor or the Debtor's Estate, including, without limitation, an Estate Representative, against (i) any Professional of the Debtor (including, without limitation, current

32

financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their successors and assigns); (ii) LOH and its respective professionals (including, without limitation, financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their respective successors and assigns); (iii) ECGC and its respective professionals (including, without limitation, financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their respective successors and assigns); (iv) the members (but not in their individual capacities) and Professionals of the Committee, (v) the current Holders of Sukuk Certificates (including, without limitation, current financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their successors and assigns); and (vi) with respect to each of the above-named Persons, such Persons' principals, employees, agents, affiliates, current and former officers and directors; *provided, however*, that nothing in this Section 8.2 shall be deemed to prohibit the Debtor, Reorganized Debtor or the Liquidating Trustee from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee that is based upon any alleged breach of fiduciary obligations owed to the Debtor or the Reorganized Debtor. For the avoidance of doubt, the releases granted by the Debtor in this Section 8.2 shall not relate to any Claims or Causes of Action specifically reserved by the Debtor pursuant to Article IX of the Plan and described in greater detail in Section III(G)(2) of the Disclosure Statement and Exhibit 2 thereto.

## 2. Discharge

**(a)** Except as otherwise specifically provided by the Plan, the confirmation of the Plan shall discharge and release the Debtor, Debtor-in-Possession, and Reorganized Debtor, their successors and assigns and their respective Assets and properties from any debt, charge, liability, encumbrance, Lien, Claim, Interests, or other Cause of Action of any kind, nature or description (including, but not limited to, any Claim of successor liability) that arose before the Confirmation Date, and any debt of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a Proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the Holder of such Claim has voted on the Plan (including, without limitation, any liabilities arising under environmental laws in respect of the Debtor or any of the Debtor's successors or assigns or their respective assets or properties or any such partnership which results, in whole or in part, from any condition, event, occurrence or happening prior to the Confirmation Date, whether or not known or unknown, discovered or undiscovered, asserted or unasserted, latent or patent, and regardless of whether any Claim was, is or could have been asserted for such liability), and upon such discharge and release, no such liabilities shall continue to be obligations of the Debtor, Reorganized Debtor, or their successors or its assets or properties, whether under the doctrine of successor liability or otherwise.

**(b)** Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by the Plan, the rights that are provided in the Plan and the treatment of all Claims will be in exchange for and will be in complete

33

satisfaction, discharge and release of (i) all Claims and Causes of Action against, liabilities of, Liens on, charges, encumbrances, obligations of any nature whatsoever, against the Debtor, Debtor-in-Possession and Reorganized Debtor or the direct or indirect assets and properties of the Debtor or Reorganized Debtor, whether known or unknown, and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtor, or the successors and assigns of the Debtor based on the same subject matter as any Claim, Interest, joint venture interest, in each case, regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Interest has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a Proof of Claim or Interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Interest has voted on the Plan.

### 3.  Continuance of Automatic Stay and Injunctions

All injunctions, Liens, or stays provided for in this Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, pursuant to Orders of the Bankruptcy Court, or otherwise, and in existence on or immediately before the Confirmation Date will remain in full force and effect until the Effective Date. Thereafter, the injunction provisions of Section 8.6 of the Plan shall take effect.

### 4.  Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Persons who have held, hold, or may hold a Claim or other debt or liability of Debtor or Interest or other right of any Debtor partner, or any other Cause of Action arising from or related to the Debtor's Chapter 11 Case, shall be permanently enjoined, on and after the Effective Date, from taking any actions on account of such Claims, debts, liabilities, or Interests or rights, including but not limited to: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest against any of the Debtor, the Reorganized Debtor, or any Professionals employed in the Debtor's case and each of their respective affiliates, current or former officers, directors, agents, members, partners, shareholders, employees and representatives; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree or order against the Debtor on account of any such Claim or Interest against the Debtor, the Reorganized Debtor, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective affiliates, current or former officers, directors, agents, members, partners, shareholders, employees and representatives; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest, or the Reorganized Debtor, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective affiliates, current or former officers, directors, agents, members, partners, shareholders employees and representatives; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to or from the Debtor, the Reorganized Debtor, or any Professionals employed in the Debtor's Chapter 11 Case and each of their respective affiliates, current or former officers, directors, agents, members,

partners, shareholders employees and representatives; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, unless in any matter involving the Debtor, the Reorganized Debtor, or any Professional retained in the Debtor's Chapter 11 Case, the matter is brought only in the Bankruptcy Court. Any person or Person injured by any willful violation of such injunction, including but not limited to filing an action in any other court or forum, shall recover actual damages, including costs and professionals' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator. The Bankruptcy Court also may impose any additional sanctions as may be appropriate under the circumstances, including contempt sanctions.

### 5. Exculpation and Limitation of Liability

(a) None of the Debtor, the Reorganized Debtor, the Creditors Committee, LOH, ECGC, the current Holders of Sukuk Certificates, or any of their respective principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, shall have or incur any liability to any holder of a Claim or an Debtor Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence, but excluding acts or omissions which are the result of fraud, gross negligence, willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b) Notwithstanding any other provision of the Plan, no holder of a Claim or a Debtor Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against the Debtor, the Reorganized Debtor, the Creditors Committee, LOH, ECGC, the current Holders of Sukuk Certificates, or any of their respective present or former principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence but excluding acts or omissions which are the result of fraud, gross negligence, willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and

35

in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## G.    Other Provisions of the Plan

### 1.    Transfer of Trust Assets by Debtor to the Liquidating Trust

Upon the Effective Date but subsequent to the execution of the Liquidating Trust Agreement, any and all property of the Debtor's Estate shall be transferred and vested in the Liquidating Trust (the "Trust Assets"), free and clear of any and all Claims, Interests, debts, Liens, security Interests, and encumbrances of any kind or type, except those Claims, debts, Liens, security Interests, and encumbrances specifically provided for under the Plan.

### 2.    Reservation of Claims

Except as otherwise provided in the Plan, all Claims and Causes of Action in favor of the Debtor or Reorganized Debtor, including but not limited to all Claims under Sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, are reserved and may be prosecuted after the Effective Date by the Reorganized Debtor. The Plan further provides that to the extent necessary, the Reorganized Debtor shall be deemed the representative of the Estate under Section 1123(b) of the Bankruptcy Code.

Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its Petition in respect of pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code. The recovery period is one (1) year if the recipient of the preferential transfer is an insider of the debtor. Certain defenses to such recoveries exist, and are provided for in the Bankruptcy Code. The Debtor is continuing to review the payments made during the ninety (90) days prior to the Petition Date to creditors and during the one year prior to the Petition Date to insiders (collectively, the "Preference Claims") to determine whether the Debtor or Reorganized Debtor should institute an action to seek recovery of such payments under Section 547 of the Bankruptcy Code. A list of the Preference Claims is attached hereto as Exhibit 2. The Debtor's review is not yet complete, and therefore, the Debtor or Reorganized Debtor reserves the right to supplement the list of Preference Claims.

Also, pursuant to the Bankruptcy Code and state law, a debtor may recover certain transfers of property, including the grant of a Lien in property, made while insolvent or which rendered it insolvent if and to the extent the Debtor received less than fair value for such property. The Debtor is continuing to review all transfers that may constitute fraudulent transfers to determine whether the Debtor should seek recovery of any such payments or transfers under Section 548 of the Bankruptcy Code.

Pursuant to Section 546 of the Bankruptcy Code, Claims under Sections 544, 545, 547, 548, 549, and 550, must be commenced no later than two (2) years after the entry of the order for relief, i.e. the Petition Date. Therefore, the Debtor or Reorganized Debtor will be required to assert such Claims on or prior to October 16, 2010.

Additionally, the Debtor specifically reserves any and all claims or Causes of Action with regard to the following:

- **The Cedar Claims:** In connection with Creel & Associates, which prepares the monthly allocation of production proceeds, the Debtor has undertaken a preliminary investigation into potential underpayments by Cedar Gas Company ("Cedar") under the Gas Purchase Agreement (the "Cedar Contract"), as amended, by and between the Debtor and Cedar. In connection with this investigation, the Debtor and Creel have discovered potential discrepancies between the Purchase Price paid by Cedar for the gas purchased from the Debtor and the Purchase Price dictated under the terms and conditions of the Cedar Contract. Additionally, the Debtor and Creel have attempted on multiple occasions to exercise the Debtor's right under the Cedar Contract to audit the books and records of Cedar with respect to its dealings with the Debtor, and such requests have been consistently denied. The Debtor therefore specifically reserves any and all Causes of Action, claims or rights that it may have against Cedar, both in tort and under the Cedar Contract, for the benefit of the Debtor's Estate. Furthermore, the Debtor specifically reserves any and all claims against Cedar arising out of or in connection with any claim by the MMS against the Debtor for an underpayment of overriding royalty interests of the MMS.

- **The Affiliate Claims:** The Debtor specifically reserves any and all rights, Causes of Action, Avoidance Claims, Preference Claims or defenses with respect to any transfers by the Debtor to the Affiliates, including those set forth in <u>Exhibit 2</u>. Moreover, the Debtor specifically reserves any and all rights and Causes of Action with respect to the recovery of any and all monies belonging to the Debtor that were improperly received and retained by certain Affiliates, including, but not limited to, the $161,039.15 received by an Affiliate, Open Choke Energy, LLC ("OCE"), from Hunt Oil Company ("Hunt") in connection with the January 31, 2006 Platform Processing Agreement (the "PPA") by and between Hunt and the Debtor, which monies were improperly retained by OCE in spite of the fact that such monies were attributable to services provided by the Debtor to Hunt under the PPA.

- **Whitney Bank Wire Transfer Fraud Claims:** The Debtor specifically reserves any and all rights and Causes of Action with respect to the recovery of the monies ($26,167.00) that have not been recovered in connection with the Whitney Bank Wire Transfer Fraud described in Section II(D)(4) of this Disclosure Statement.

### 3. Objections to Claims

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date, unless extended by order of the Court, objections to Claims shall be filed with the Court. Under the Plan, the Liquidating Trustee has full right, power and authority to investigate and if necessary, object to and settle any Claim or objection any Claim after the Confirmation Date.

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim to the extent it is a contested Claim, unless and until such contested Claim

becomes an Allowed Claim. All Disputed Claims are not entitled to vote with respect to the Plan, unless such Claim is estimated, for voting purposes, by order of the Court.

Distributions due to Holders of Allowed Claims are determined by computing the Distributions required by the Plan as if all disputed Claims are Allowed Claims in the full amount claimed by the Holder thereof. Distributions for Holders of Disputed Claims shall be reserved and segregated, pending determination of entitlement thereto under the terms of the Plan. At such time that a Disputed Claim becomes an Allowed Claim, the Distribution reserved for such Claim shall be delivered to the Holder of such Allowed Claim as provided for in the Plan.

The Liquidating Trustee will withhold from the property to be distributed to Holders of Claims or Interests within a given class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the date on which such Distribution would have been made to the Holder of the Disputed Claim if the Claim was, in fact, an Allowed Claim, and will place such withheld property in the Disputed Claim Reserve; provided, however, that in no event shall the Liquidating Trustee place in Disputed Claim Reserve amounts for classes of Claims which shall receive no Distribution pursuant to the Plan. The Debtor will analyze the variances between its records and filed Proof of Claims, and reserve such amounts.

### 4. Default Under the Plan

Article XI of the Plan provides that the Holder of an Allowed Claim may notify the Liquidating Trustee in writing of a default under the Plan. If such a written notice of a default is transmitted to the Liquidating Trustee, the Liquidating Trustee, or any party in interest will have thirty (30) days from receipt of the notice to cure the alleged default. If the alleged default is not cured, the aggrieved party is authorized to seek relief from the Bankruptcy Court. Additionally, in the event that an Entity other than the Liquidating Trustee acts or fails to act in compliance with the Plan, the Liquidating Trustee may seek to hold that Entity in contempt of the Confirmation Order and to have appropriate sanctions imposed.

### 5. Modification of the Plan

Pursuant to Article XII of the Plan, the Debtor reserves its right according to the Bankruptcy Code, to amend or modify the Plan before the Confirmation Date. After the Confirmation Date, the Liquidating Trustee may, upon order of the Bankruptcy Court, and according to Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

### 6. Revocation of the Plan

The Debtor may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then it will be deemed null and void.

### 7. Payment of Statutory Fees

United States Trustee's fees do not require allowance by the Court and both pre-confirmation and post-confirmation fees payable pursuant to Section 1930 of title 28 of the United States Code will be paid in cash and in full pursuant to the applicable provisions of the Bankruptcy Code and other statutory provisions by the Reorganized Debtor.

### 8. Payment of Post-Confirmation Fees and Expenses

From and after the Confirmation Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Liquidating Trustee will pay the reasonable fees and expenses of professional persons thereafter incurred by the Liquidating Trustee, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan. The payments by the Liquidating Trustee shall be made from the funds of the Liquidating Trust.

### 9. Exemption from Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any and all sales or transfers of assets, by the Debtor or the Reorganized Debtor, the creation of any mortgage, deed of trust or other security interest or Lien, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan or any Asset Purchase Agreement, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the sales, transfers, Distributions or transactions contemplated under the Plan and any agreement to purchase an Asset shall not be subject to any stamp, sales, real estate transfer, mortgage recording, or other similar tax.

### 10. Retention of Jurisdiction

The Plan provides for the Bankruptcy Court to retain jurisdiction over many aspects of the Plan. The specific purposes for which the Bankruptcy Court retains jurisdiction with respect to the Reorganization Case are set forth in Article XIII of the Plan.

## IV. FINANCIAL INFORMATION

### A. Current Financial Statement and Information

The Debtor has filed its Schedules, as amended, which contain a schedule of the Debtor's assets and liabilities as of the Petition Date. The Debtor has also filed a Statement of Financial Affairs containing information regarding its operations. In addition, monthly operating reports ("MORs") have been filed with the United States Bankruptcy Court for the Western District of Louisiana for the months of October 2008 through February 2010. These documents, as amended, present the financial position and operating results of the Debtor for the relevant period before and after the Petition Date. Creditors are advised to review these documents to fully understand the Assets and liabilities of the Debtor.

In the period between October 2008 and February 2010, the Debtor's income statement can

be summarized as follows:[29]

| | October 2008 | November 2008 | December 2008 | January 2009 | February 2009 | March 2009 | April 2009 |
|---|---|---|---|---|---|---|---|
| Net Revenue | 473,932 | 477,762 | 592,081 | 246,891 | 3,379,036 | 471,742 | 547,886 |
| Cost of Sales | 86,652 | 588,630 | 1,196,963 | 461,562 | 1,071,571 | 728,086 | 697,900 |
| Gross Profit | 387,280 | (110,868) | (604,882) | (214,671) | 2,307,465 | (256,344) | (150,014) |
| Total Operating Expenses | 82,636 | 531,850 | 664,001 | 48,175 | 3,080,059 | 2,787,900 | 1,170,207 |
| Income (before depreciation or taxes) | 304,645 | (642,718) | (1,268,883) | (262,846) | (772,594) | (3,044,244) | (1,320,221) |
| Depreciation or Amortization | -- | -- | -- | -- | -- | 578,961 | 596,816 |
| Net Income | 304,645 | (642,718) | (1,268,883) | (262,846) | (772,594) | (3,623,205) | (1,917,037) |

| | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 |
|---|---|---|---|---|---|---|
| Net Revenue | 1,182,591 | 370,221 | (10,870) | 99,772 | 83,544 | 431,667 |
| Cost of Sales | 450,870 | 552,329 | 749,121 | 787,121 | 530,674 | 336,034 |
| Gross Profit | 731,721 | (182,108) | (759,992) | (687,989) | (447,130) | 95,663 |
| Total Operating Expenses | 1,591,970 | 859,729 | 747,807 | 394,659 | 966,319 | 499,115 |
| Income (before depreciation or taxes) | (860,249) | (1,041,837) | (1,507,799) | (1,107,648) | (1,438,449) | (428,552) |
| Depreciation or Amortization | 184,785 | 176,811 | 176,811 | 196,726 | 454,933 | 543,629 |
| Net Income | (1,045,034) | (1,218,649) | (1,664,610) | (1,304,374) | (1,893,382) | (972,081) |

29    The Debtor, with the assistance of its professionals, is currently undertaking a wholesale review and revision of the Monthly Operating Reports filed for the months of October 2008-February 2009 based upon the accounting analysis performed by P&N during the preparation of the Monthly Operating Reports beginning in March 2009.

40

|  | November 2009 | December 2009 | January 2010 | February 2010 |
|---|---|---|---|---|
| Net Revenue | 363,339 | 532,317 | 821,214 | 824,487 |
| Cost of Sales | 239,674 | 282,247 | 372,435 | 276,223 |
| Gross Profit | 123,665 | 250,069 | 448,779 | 492,043 |
| Total Operating Expenses | 315,498 | 340,084 | 1,296,086 | 926,157 |
| Income (before depreciation or taxes) | (216,833) | (115,014) | (872,307) | (658,011) |
| Depreciation or Amortization | 538,946 | 603,284 | 634,402 | 578,158 |
| Net Income | (755,779) | (718,298) | (1,506,709) | (1,236,169) |

        **1.**     **Debtor's Assets.** Creditors are referred to the Debtor's Bankruptcy Schedules and Monthly Operating Reports for a discussion of the Debtor's Assets as of the Petition Date. A copy of Schedule B of the Debtor's Bankruptcy Schedules, as amended, is attached hereto as <u>Exhibit 3</u>.

        **2.**     **Debtor's Liabilities.** As of the filing of this Disclosure Statement, the Debtor had liabilities of approximately $4,752,167.26. However, the Debtor reserves and does not waive any right to file an objection to any of the Claims filed in this matter including the above-described Claims.

## V.    <u>MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN FOR THE DEBTOR AND CERTAIN HOLDERS OF CLAIMS</u>

        The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims and Interests. The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes to the Tax Code or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below. The following summary does not address foreign, state, or local tax consequences of the Plan, nor does it address the United States federal income tax consequences of the Plan to the particular circumstances of any Holder or to Holders subject to any special income tax rules (such as banks, governmental authorities or agencies, pass through entities, brokers and dealers in securities, mutual funds, regulated investment companies, insurance companies, financial institutions, small business investment companies, trusts, estates, and tax-exempt organizations). Furthermore, this summary does not apply to Holders of Claims or Interests that are not United States persons (as such term is defined in the Tax Code).

        The United States federal income tax consequences of the Plan are complex and are subject

to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. The Debtor has not requested any ruling from the IRS or an opinion of outside tax counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

Furthermore, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and the Holders of Claims or Interests. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN SHOULD CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH ANY OFFERING FOR SALE OF SECURITIES.

**IRS CIRCULAR 230 DISCLOSURE:** IN COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS AND ALL OTHER INTERESTED PARTIES ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE AND WAS WRITTEN IN CONNECTION WITH AND FOR THE SOLE PURPOSE OF PROMOTION OF THE PLAN.

A.    **Tax Consequences to the Reorganized Debtor and Debtor Partners**

1.    **Overview**

The Debtor is treated as a partnership for purposes of determining federal income tax. In general, subchapter K of the Tax Code governs the taxation of partnerships and their partners. A partnership is not a separate tax-paying entity. Rather, the individual partners are taxed on the economic activity that occurs on the partnership level. The partnership passes its items of income, gain, deduction, loss and credit to its partners regardless of whether actual distributions are made by the partnership to the partners. Accordingly, tax treatment is affected by individual characteristics of each Debtor Partner's interest in the Debtor. In determining the tax consequences of the Plan to any Debtor Partner, attention must be paid to the tax classification of the Debtor Partner and its interest in the Debtor, the outside basis of such Debtor Partner, and the distributive share attributable to each such Debtor Partner.

42

The tax consequences to the Reorganized Debtor and Debtor Partners are further complicated by the tax treatment of LOH. The Debtor is the sole member of LOH and, accordingly, LOH is taxed as an entity disregarded from the Debtor. All items of income, gain, deduction, loss and credit attributable to LOH are presumably passed through to the Debtor, and consequently to the Debtor Partners. Therefore, in considering the tax consequences of the Plan to the Reorganized Debtor or any Debtor Partner, consideration must be given to the tax treatment of LOH.

## 2. Discharge of Partnership Debt

The rules governing the tax consequences of discharge of indebtedness in a bankruptcy proceeding instituted by an entity taxed as a partnership are complicated. In some instances the general discharge of indebtedness rules apply at the partner level and in other instances they apply at the partnership level. Further, in some circumstances whether the rules should apply at the partner level or the partnership level remains unclear.

In general, when a partnership obtains a discharge of partnership debt in a bankruptcy proceeding two things occur. First, the discharge of partnership debt generates cancellation of indebtedness income at the partnership level, which passes through to the partners and which may or may not be eligible for exclusion under section 108(a) of the Tax Code (as discussed more fully in (a) below). Second, the discharge of a partnership debt triggers a deemed distribution of money from the partnership to the partners under section 752(b) of the Tax Code (as discussed more fully in (b) below).

### a. Cancellation of Indebtedness Income as COD Income

The first common consequence of a bankruptcy proceeding involving a partnership debtor is that the cancellation of indebtedness generates income which is passed through to the partners. Absent an exception, the Tax Code generally provides that taxpayers that realize a "cancellation of debt income" ("COD Income") must include the amount of canceled indebtedness in gross income to the extent that the indebtedness canceled exceeds any consideration given for such cancellation. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

However, Section 108(a)(1) of the Tax Code provides that a taxpayer is not required to include any amount of COD Income in gross income if: (a) the discharge occurs in a chapter 11 bankruptcy case; (b) the discharge occurs when the taxpayer is insolvent; (c) the indebtedness discharged is qualified farm indebtedness; (d) in the case of a taxpayer other than a C corporation, the indebtedness discharged is qualified real property business indebtedness; or (e) the indebtedness discharged is qualified principal residence indebtedness which is discharged before January 1, 2010. In exchange for the benefit of Section 108(a)(1), Section 108 of the Tax Code also provides that a taxpayer eligible for the preferential treatment must reduce its tax attributes by the amount of COD Income that is excluded from gross income under Section 108. Generally, Section

43

108(b) requires that tax attributes be reduced in the following order: (a) any net operating loss ("NOL") for the taxable year of the discharge, and any net operating loss carryover of such taxable year; (b) any carryover to or from the year of discharge of an amount for purposes for determining the amount allowable as a credit under Section 38 (general business credit); (c) the amount of the minimum tax credit available under Section 53(b) (relating to the minimum tax credit) as of the beginning of the taxable year immediately following the taxable year of the discharge; (d) any net capital loss for the taxable year of the discharge, and any capital loss carryover to such taxable year under Section 1212; (e) the basis of the property of the taxpayer/debtor; (f) any passive activity loss or credit carryover of the taxpayer/debtor under Section 469(b) from the taxable year of the discharge; and (g) any carryover to or from the taxable year of the discharge for purposes of determining the amount of credit allowable under Section 27 (relating to foreign tax credits). A taxpayer with COD Income may elect to first reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code.

In the case of a business entity taxed as a partnership, such as the Debtor, the exclusions provided by Section 108(a) apply at the partner level rather than at the partnership level. The fact that a partnership is in a chapter 11 case or is insolvent when it obtains a discharge of indebtedness will have no effect on the treatment of the COD Income at the Partner level. The COD Income will pass through to each partner as a separately allocated item of income, which will be taxed to the partner as ordinary income. All partners will recognize their allocable shares of the COD Income unless Section 108(a) provides a partner with exception to recognition. In such event, the partner, not the partnership, will make the reduction of tax attributes and/or basis reduction required by Section 108(b). Thus, for example, a partner that is insolvent at the time of the COD Income may be able to exclude a portion of the COD Income pursuant to Section 108(a), subject to the reduction of tax attributes provisions of Section 108(b).

Because the Plan contemplates that some Holders may receive property or rights in property, rather than Cash, in satisfaction of their Claims, the amount of COD Income, and accordingly, the amount of tax attributes required to be reduced or the COD Income required to be included by each partner, will partially depend on the fair market value of the properties or rights in property exchanged or reinstated in satisfaction of those Claims. The fair market value cannot be known with certainty until after the Effective Date. Furthermore, the Plan contemplates that not all Claims will be fully satisfied meaning that, with certain exceptions, to the extent that any Holder receives from the Reorganized Debtor a distribution under the Plan in an amount less than such Holder's Claim or to the extent that a Holder is not entitled to receive any distribution in satisfaction of such Holder's Claim, the Reorganized Debtor will realize COD Income, which will be passed through to the Debtor Partners. The amount of such COD Income to be realized cannot be determined until after the Effective Date. Once determined, a reduction of tax attributes by each Debtor Partner, as described above, may be required.

**b.      Cancellation of Indebtedness as Deemed Distribution**

The second common consequence of a partnership Chapter 11 bankruptcy proceeding is that the discharge of partnership debt in the bankruptcy triggers a deemed distribution of money

44

from the partnership to the partners under section 752(b) of the Tax Code. The deemed distribution of money from the partnership will generally be taxable to the extent the deemed distribution exceeds each partner's outside basis. As was discussed above, the realization of COD Income by a partner will generally increase such partner's outside basis. Depending on how a partnership allocates the discharge of indebtedness to each partner, the resulting increase in basis may equal the amount of the deemed distribution, in which case the discharge of partnership debt will not result in a taxable distribution. However, in some instances the deemed distribution will cause the partners to recognize gain. In the instant case, each Debtor Partner must determine its distributive share of COD Income, deemed distributions, and its outside basis in order to calculate its tax liability.

### 3. Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes

The Reorganized Debtor expects to have NOL carryovers and other tax attributes at emergence, although the Debtor is presently unable to ascertain the precise amount, which will be calculated based on a number of factors and is impossible to calculate at this time. Because the Reorganized Debtor will be a partnership, the benefit of any such NOL carryovers will be passed through to the Debtor Partners. If any Debtor Partner was eligible for non-recognition of COD Income under Section 108(a) of the Tax Code, such Debtor Partner may be required to make a reduction of its share of NOL carryovers in accordance with Section 108(b) of the Tax Code.

### 4. Liquidation of Debtor

The Plan contemplates that all existing Debtor Interests will be cancelled and terminated as of the Effective Date. Under Section 708(b)(1)(A) of the Tax Code, regardless of state and local partnership law, a partnership "shall be considered as terminated only if no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners..." If a partnership terminates, the tax year closes for all partners. If the partnership of the Debtor is considered terminated due to the Plan, then the tax year of all Debtor Partners will likewise terminate. Such a termination would have additional effects on each of the Debtor Partners in accordance with the rules in the Tax Code governing partnership distributions and liquidations.

The rules governing liquidation of partnerships are complex. Each Debtor Partner should consult with its tax advisor to determine what effect the Plan may have on such Debtor Partner.

45

**B.     Tax Consequences to Certain Holders of Claims**

**1.     General Overview**

**a.     Factors Affecting the Tax Treatment of Holders' Gain or Loss**

The following discussion will consider some of the potential tax consequences to Holders of Claims resulting from the Plan. This discussion is intended for general informational purposes only. Generally, a Holder who receives consideration from the Debtor or Reorganized Debtor in exchange for the discharge of its Claim will recognize gain or loss on the transaction. Non-recognition of gain or loss is permitted in certain narrow circumstances. The gain or loss is typically the difference between the amount realized (i.e. the issue price of indebtedness received, plus the cash and fair market value of any property received) less any amount allocable to interest, and the Holder's basis in the Claim released. The tax treatment of the gain or loss realized by any specific Holder will necessarily depend on a number of variables. For instance, the organizational classification of the Holder for tax purposes (i.e. individual, partnership, S corporation, C corporation, real estate investment trust, financial institution, insurance company, etc.) will significantly affect the rules governing the Holder's tax treatment of gain or loss under the Tax Code. The Holder's accounting method (cash, accrual, or some modification thereof) will affect, among other issues, the timing of recognition of income, losses and deductions. The tax residence of the Holder is also significant. For example, whether a foreign Holder is subject to United States federal income tax liability will depend on, among other factors, whether such Holder is engaged in a trade or business in the United States and which foreign county the Holder resides in. The tax characterization of the Holder's Claim will also affect the taxation of any gain or loss resulting from the discharge of that Claim. For example, whether the Claim represents ordinary income from services, ordinary income from the sale of goods or merchandise, other ordinary income, or a capital asset will affect the tax treatment of the Claim in the hands of the Holder. If the Holder's Claim is classified as a capital asset, the Holder's holding period of the Claim will determine whether the Claim is subject to long-term or short-term capital gain or loss treatment.

**b.     Receipt of Interest**

Consideration received by a Holder that is allocable to accrued but unpaid interest is generally treated as ordinary income regardless of whether the Holder's Claims are capital assets. A Holder may be required to adjust the amount of interest realized and recognized in accordance with the original issue discount and market discount rules discussed below. It is expected that a portion of the Cash or property received by some Holders will be attributable to accrued but untaxed interest on such Claims. Such a Holder will likely be subject to tax on the portion of consideration allocable to interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes, regardless of whether such Holder realizes an overall gain or loss as a result of the exchange. However, a Holder who previously included in income accrued but unpaid interest attributable to its Claims will generally recognize a loss to the extent such accrued but unpaid interest is not satisfied in full by the Distribution.

46

If the amount of Cash or fair market value of property received by a Holder is insufficient to fully satisfy all principal and interest on the Claim, the extent to which the consideration will be attributed to accrued but untaxed interest is unclear. It is also unclear what position the IRS will take with respect to allocation between principal and interest. Holders should consult their own tax advisors regarding the proper allocation of the consideration they receive under the Plan.

### c.     Original Issue Discount and Market Discount

Certain Holders who receive deferred payments in exchange for their Claims may be affected by the original issue discount ("OID") provisions of sections 1276 through 1278 of the Tax Code. The OID rules require that all covered debt instruments bear a minimum rate of interest that accrues regularly over time. To the extent the terms of the debt instrument do not provide for such accrual, the OID rules convert principal into interest and deem it to accrue regularly over time, irrespective of when it is actually paid. If a debt instrument bears interest, but that interest is not regularly paid, the OID rules require that the interest be accrued so that it is spread over the term of the debt instrument. Each Holder should consult with its tax advisor and make its own determination as to whether it is subject to the OID rules. The interest, including that portion imputed to interest under the OID rules, would be taxed as ordinary income even if the Claim constitutes a capital asset in the hands of the Holder.

### d.     Installment Method Reporting

The Plan contemplates that some Holders will not receive Distributions in discharge of their Claims up front, but rather, will be paid out over time. Section 453 of the Tax Code permits a taxpayer to report gain on the sale of property on the installment method or to include the gain currently. The installment method requires recognition of gain at the time of and in proportion to the payments made in satisfaction of a Claim. The installment method is not available in all cases. For instance, the installment method is not available to the extent the debt instrument received is readily tradable on an established securities market. Additionally, the installment method may be unavailable if the Holder's Claim arises out of the sale of personal property of the type that the Holder normally sells on the installment plan or treats as inventory or real property. Under Section 453A, a Holder electing to utilize the installment method may be required to pay interest on the deferred taxes resulting from the installment method if the value of the Claim exceeds $150,000. Additional rules and regulations may require recognition of gain in full upon the disposition of such an installment obligation.

Each Holder should consult with its own tax advisor regarding its eligibility for installment method reporting and whether such an election would benefit the Holder.

### e.     Bad Debt Deduction

Section 166 of the Tax Code allows for deductions of worthless and partially worthless indebtedness in certain circumstances. Section 166 does not apply to public, corporate or

47

governmental indebtedness. The deduction is not available for all types of taxpayers. Additional limitations apply where the debt is a "nonbusiness debt", as defined in the statute.

Section 166 generally permits a deduction for indebtedness that becomes wholly worthless during the tax year. The amount of the deduction allowed is the creditor's adjusted basis in the indebtedness at the time of the worthlessness. The deduction is only allowed if the taxpayer can establish some identifiable event indicating that the debt has become worthless. Any prospect of recovery will eliminate a claim of total worthlessness. The Plan contemplates that most Holders will receive some payment on their debt, so a deduction for wholly worthless bad debt may not be available until and unless it is clear no recovery will be had.

Section 166 also allows for a deduction for partially worthless debts. A partially worthless debt has some prospect of recovery, but such recovery will be less than the tax basis of such indebtedness. This deduction is likely to apply to some Holders and, accordingly, each Holder should make an independent determination as to the availability of the deduction. In order to take a deduction for a partially worthless debt, the taxpayer is required to charge off on its books the portion of the indebtedness that is partially worthless.

### 2. Consequences to Holder of Class 1 Claim: Other Priority Claim

The Plan contemplates that on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the Debtor and such holder shall have agreed upon in writing; *provided*, that such treatment is on more favorable terms to the Debtor (or the Reorganized Debtor after the Effective Date), than the treatment set forth in clause (A) above.

Holders of Class 1 Claims receiving payment in Cash equal to the full amount of the unpaid portion of such claim would be treated as having entered into a taxable exchange under Section 1001 of the Tax Code. The Holder would recognize gain or loss on the exchange, which would be determined and treated in light of the factors set forth under this Section V(B)(1). Similarly, Holders of Class I Claims receiving some other consideration as agreed between Debtor and the Holder will likely also be treated as having entered into a taxable exchange under Section 1001 of the Tax Code. The Holder would recognize gain or loss on the exchange, which would be determined and treated in light of the factors set forth under this Section V(B)(1).

### 3. Consequences to Holders of Class 2 Claims: Secured Claims

The Plan contemplates Holders of Allowed Secured Claims in Class 2 will receive, at the election of the Debtor, either (i) the legal, equitable, and contractual rights of each holder of an

48

Secured Claim will be Reinstated or (ii) each holder of an Secured Claim shall receive treatment so as to render Unimpaired such Secured Claim. Under either scenario, the Holder of a Class 2 Claim may be treated as having entered into a taxable exchange under Section 1001 of the Tax Code. The Holder of such a claim would recognize gain or loss on the exchange, which would be determined and treated in light of the factors set forth in Section B(1). However, valuing the tax consequences of such an exchange may be more complicated than some of the other Claims discussed herein. For instance, evaluating the tax consequences of reinstating legal, equitable, and contractual rights will likely require a valuation of such rights at various points in time, which may be difficult.

4. **Consequences to Holders of Class 3 Claims: General Unsecured Claims**

The Plan contemplates that each Holder of a Class 3 Claim, excluding the Holders of Subordinated Unsecured Claims, will receive, on, or as soon as reasonably practicable after, the Effective Date and in full discharge of, in exchange for, and on account of such Allowed Claim, its Pro Rata share of Distributions, if any, to be made from the Liquidating Trust to be established pursuant to Section 5.2 of the Plan as of the Effective Date. The Holder would recognize gain or loss on the exchange, which would be determined and treated in light of the factors set forth in Section B(1). The Plan anticipates that the Holders of Class 3 Claims will not be paid in full, accordingly, the discussion above pertaining to bad debt deductions is particularly relevant to such Claim Holders. Additionally, in the event that Distributions are made in installments, the discussion above pertaining to installment method reporting would be of particular significance to Holders of Class 3 Claims.

5. **Consequences to Holders of Class 4 Claims: Subordinated Unsecured Claim**

The Plan contemplates that Holders of Subordinated Unsecured Claims will not receive or retain any property on account of such Claims. All Subordinated Unsecured Claims will be discharged as of the Effective Date. Such discharge may be treated as a taxable exchange on which the Holder would recognize gain or loss, which would be determined and treated in light of the factors set forth in Section B(1). Additionally, because Holders of Class 4 Claims will not receive or retain any payment or property in satisfaction of their Claims, the discussion above pertaining to bad debt deductions may be pertinent.

6. **Consequences to Holders of Class 5 Claims: Debtor Interest Unsecured Claims**

The Plan contemplates that all Debtor Interests shall be cancelled as of the Effective Date and the holders thereof shall not receive or retain any property under the Plan on account of such Debtor Interests. As discussed in Section A, above, the cancellation of Debtor Interests may result in the partnership being treated as terminated and the tax year closed with respect to each Debtor Partner. In such a event, the provisions of the Tax Code pertaining to partnership liquidation would be applicable in determining the tax treatment of Holders of Class 5 Claims.

49

### C. Information Reporting and Backup Withholding

The information reporting requirement may apply to Distributions or other payments or Transfers made pursuant to the Plan. Certain Holders may be subject to the backup withholding, which is essentially an advance payment made to the IRS that may be refunded to the extent it results in an overpayment of tax. Accordingly, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions unless that Holder falls within an exemption category and, when required to do so, such Holder provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

The Debtor and Reorganized Debtor will comply with all applicable reporting and withholding requirements of the Tax Code.

### D. The Disputed Claims Reserve

From and after the Effective Date, and until such time as all of the objections to Claims have been resolved by Final Order and Distributions to the Holders of Disputed Claims have been accomplished pursuant to such Final Order, the Reorganized Debtor shall maintain the Disputed Claims Reserve. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims if and when such Claims are subsequently Allowed and to the Reorganized Debtor for uses consistent with the terms of the Plan when any Disputed Claims are subsequently disallowed. Such Distributions should be taxable to the recipient in accordance with the principles discussed in the above paragraphs.

## VI. ALTERNATIVES TO THE PLAN

If the Plan were not confirmed, then one alternative would be the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, which would require the immediate appointment of a Chapter 7 bankruptcy trustee to liquidate the remaining assets of the Debtor and to distribute the proceeds of that liquidation. The Debtor believes that trustee costs will reduce recovery significantly.[30] Moreover, Chapter 7 liquidation will most likely significantly reduce any recovery by the General Unsecured Creditors.

A second alternative in the event the Plan is not confirmed is that the Debtor, a Creditor, the Committee or another party in interest could attempt to formulate and propose a different plan of reorganization or liquidation. While such a plan is possible, the Debtor does not believe that an alternate plan under Chapter 11 of the Bankruptcy Code can be formulated that will provide for any greater recovery to Creditors than provided for under the Plan. The delay associated with the filing

---

30      *See* the Debtor's Liquidation Analysis attached at <u>Exhibit 5</u>.

and confirmation of an alternative plan of reorganization would necessarily reduce recovery by the General Unsecured Creditors.

The Debtor believes that these factors clearly evidence that the Debtor's proposed Plan is superior to liquidation under Chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the filing of an alternate plan of reorganization or liquidation. The Debtor also believes that the Plan results in a fair balancing of all parties' rights, and again urges all Creditors and Holders of Interests to vote to accept the Plan.

## VII.   VOTING PROCEDURES

To be confirmed by the Bankruptcy Court, the Plan must be accepted by each Class of Claims and Existing Partnership Interests whose rights are Impaired by the provisions of the Plan. Generally, a Claim that will not be paid in full is considered "Impaired." Under the Bankruptcy Code, a Class of Claims or Interests is deemed to have accepted the Plan if the Plan is accepted by Claimants or Interest Holders in such a Class holding at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests of such Class that in each case have actually voted on the Plan.

### A.     Ballots and Voting Deadline

Ballots are to be used for voting on the Plan. Completed Ballots should be sent to:

> **East Cameron Partners, L.P.**
> **Attention: Stewart F. Peck**
> **Lugenbuhl, Wheaton, Peck,**
> **     Rankin & Hubbard**
> **601 Poydras Street, Suite 2775**
> **New Orleans, LA 70130**

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M., CENTRAL STANDARD TIME, ON _____ __, 2010 (THE "BALLOT DATE"). ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR INTEREST THAT DOES NOT SHOW AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.

NOTE: FAXED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE WILL NOT BE COUNTED.

Ballots, attached hereto as Exhibit 4, have been prepared for Claimants.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT

51

COUNSEL FOR THE DEBTOR AT THE FOLLOWING ADDRESS AND TELEPHONE NUMBER:

> Mr. Stewart F. Peck
> Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
> 601 Poydras Street, Suite 2775
> New Orleans, LA 70130
> Telephone: (504) 568-1990
> Facsimile: (504) 310-9195

You may be contacted by representatives of the Debtor with regard to your vote of the Plan. Votes cast by Holder of Claims and Interests will be irrevocable once received by the Debtor, unless the Bankruptcy Court, after application, notice and hearing, permits a change of vote. If any ballot received by the Debtor is not discernible as to the Class of the Claim or Interest of the name of the Holder thereof, such ballot will be disregarded and not counted.

### B.  Claims and Existing Ownership Interests Entitled to Vote

Each Holder of an Allowed Claim in an Impaired class of Claims shall be entitled to vote separately to accept or reject the Plan as provided in such Order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other Order or Orders of the Bankruptcy Court. Notwithstanding the foregoing, Holders of Claims in Classes 4 and 5 are deemed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### VIII.  CONFIRMATION OF THE PLAN

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor has disclosed specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also imposes requirements that, given an Impaired Class, at least one Class of Impaired Claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims or Interests Impaired under the Plan. The Bankruptcy Court may confirm the Plan only if it finds that all of the requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met. The Debtor believes that the requirements for confirmation have been satisfied.

### A.  Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold the Confirmation Hearing upon appropriate notice to all creditors. Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

52

By Order of the Bankruptcy Court dated _____, 2010, the Confirmation Hearing has been scheduled for _____ _____, 2010, at _____ a.m., at the United States Bankruptcy Court, Western District of Louisiana, 214 Jefferson Street, Lafayette, Louisiana 70501. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice to creditors or parties in interest except an announcement made at the Confirmation Hearing or any adjournment of it. Any objection to confirmation must be written and filed with the Bankruptcy Court with proof of service and served upon the following parties on or before_____ __, 2010:

**Stewart F. Peck**
**Lugenbuhl, Wheaton, Peck**
**Rankin & Hubbard**
**601 Poydras Street, Suite 2775**
**New Orleans, LA 70130**

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.** **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan. If the Bankruptcy Court determines that such requirements have been satisfied, an order will be entered confirming the Plan. The requirements of Section 1129 are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and is not by any means forbidden by law.

4. The Debtor will pay for services or for costs and expenses in, or in connection with, the reorganization case, or in connection with the Plan and incident to the reorganization case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

53

5.    The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in the Plan with the Debtor, or a successor to the Debtor under the Plan. The appointment to, or continuance in, such office of such individual is consistent with the Interests of creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider.

6.    With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Distribution Date under the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

7.    Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

8.    Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and other Priority Claims will be paid in full on the Distribution Date.

9.    If at least one Impaired Class exists, at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

10.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that the Plan (i) satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) complies with or will comply with all of the requirements of Chapter 11, and (iii) was proposed in good faith. The Debtor further believes that Holders of all Claims and Interests under the Plan may ultimately receive payments under the Plan having present value as of the Distribution Date in amounts not less than the amounts likely to be received by holders of such Claims if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.

54

## C. Cramdown

If any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" within the meaning of the Bankruptcy Code. A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its Claims or Interests. "Fair and equitable" has different meanings for secured and unsecured Claims.

With respect to a secured Claim, "fair and equitable" means either (i) the Impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Distribution Date at least equal to the value of such creditor's interest in the property securing its Liens; or (ii) property subject to the Lien of the Impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale, and such Lien proceeds must be treated in accordance with clauses (i) or (iii) herein; or (iii) the Impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to an Unsecured Claim, "fair and equitable" means either: (i) each Impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

In the event one or more Classes of Impaired Claims or Interests rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests.

## D. Feasibility

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11).

The Debtor's Plan is a liquidating Plan which specifically contemplates the liquidation of all remaining assets of the Debtor and Distribution of the proceeds of that liquidation to the Creditors of the Debtors' estates. The Debtors believe that the Plan proposes a suitable method for such liquidation and Distribution and that Confirmation of the Plan is not likely to be followed by the need for any further financial reorganization. Therefore, the Plan is feasible and satisfies the requirements of Section 1129 of the Bankruptcy Code.

## IX.   CONCLUSION

The Debtor believes that Confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Claims and Interests. In addition, other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. **THEREFORE, THE DEBTOR URGES HOLDERS OF CLAIMS AND INTERESTS TO VOTE IN FAVOR OF THE PLAN.**

Respectfully submitted this 13th day of April 2010.

EAST CAMERON PARTNERS, L.P.
Debtor and Debtor-in-Possession

Through its Chief Restructuring Officer, Goldking
Capital Management, LLC

By: _Leonard C. Tallerine, Jr._
Leonard C. Tallerine, Jr.

AND

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD

STEWART F. PECK (#10403)
CHRISTOPHER T. CAPLINGER (#25357)
BENJAMIN W. KADDEN (#29927)
ELIZABETH R. CARTER (#31090)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
*Attorneys for East Cameron Partners, L.P.*

56